## MEDICAL & SURGICAL MEMORIAL HOSPITAL v. CAUTHORN.

No. 4762.

Court of Civil Appeals of Texas. El Paso.

Dec. 31, 1949.

Rehearing Denied Jan. 25, 1950.

Eskridge & Groce, San Antonio, Warren & Groce, Corpus Christi, for appellant.

Stahl & Sohn, Al J. Klein, San Antonio, for appellee.

SUTTON, Justice.

This appeal is from a judgment of the 57th District Court of Bexar County.

P. H. Cauthorn sued the Medical & Surgical Memorial Hospital to recover damages sustained as the result of a burn to his great toe and the two adjacent toes while a patient in the Hospital. The facts were tried to a jury and the case submitted on special issue on the answers to which judgment was rendered for the plaintiff in the sum of $5,500.00, from which the Hospital prosecutes this appeal.

The plaintiff entered the Hospital on February 1, 1947, for the treatment of a diabetic ulcer on the sole of his foot and near the great toe. His physician prescribed heat treatments to be applied by means of a heat cradle, the heat to be applied alternately hourly, that is, the heat to be applied for one hour and discontinued for an hour and applied again for an hour and discontinued for an hour, etc. Plaintiff alleged in that connection it was the nondelegable duty of the defendant hospital to supply for such treatment a safe and customary type of heat cradle, but that it negligently failed to do so but instead supplied an improvised and makeshift heat-cradle, and further charged negligence on the part of a nurse assigned to attend him, but this latter claim of negligence is not involved on the appeal.

The defendant filed a general denial; a plea of contributory negligence, which is also not here involved, and specially that it is a corporation organized and operated for purely public charity and educational purposes and exempt from tort liability.

The plaintiff filed a supplemental petition wherein he pleaded various grounds and facts which he claimed destroyed the claimed immunity. Very much of the proof in the case was directed toward that issue and much of the briefs are devoted to it.

On the theory pleaded by plaintiff the defendant hospital was negligent in failing to provide a safe heat cradle for the treatment of plaintiff, the Court submitted three special issues, which were:

"Do you find from a preponderance of the evidence that the defendant failed to provide the plaintiff with a heat cradle that was sufficient to safely provide heat for plaintiff's foot?

"Do you find from a preponderance of the evidence that such failure, if any, to provide plaintiff with a heat cradle that was sufficient to safely provide heat for plaintiff's foot was negligence?

"Do you find from a preponderance of the evidence that such negligence, if any, was a proximate cause of the injuries, if any, sustained by plaintiff?"

The jury answered each such issues in the affirmative.

The defendant has five points, the first three of which are briefed together, and have to do with its claimed exemption from tort liability because of its charity character. Under this grouping the defendant argues it is not liable notwithstanding the findings of the jury in response to the special issues above, and relies upon the cases of Southern Methodist University v. Clayton, 142 Tex. 179, 176 S.W.2d 749 and Scott v. Rice, Tex.Civ.App., 178 S.W.2d 156, e. r.

Plaintiff has resided in Bexar County for thirty years and had had a wooden right leg since he was 17 years old. His age does not appear. As heretofore noted he was admitted to the hospital for the treatment of a diabetic ulcer. Because of the diabetic condition his left foot was numb. The treatment prescribed has already been noticed. Mrs. Alfredo Hassell had been connected with the hospital since 1927, and had been Superintendent since 1940. She testified heat cradles are supplied by hospitals for treatments ordered by attending physicians. Mr. Arthur Moede, business manager of the hospital since 1940, described a heat cradle thus: "The frame is

constructed of a heavy wire or a light weight metal. The metal is so constructed that it will support a covering, either canvas or blanket. The socket which holds the globe is welded or fastened onto the metal frame. The framework itself has no bottom to it, due to the fact that you want the entire heat to penetrate to the patient or onto the bed. By comparison, the shade may be compared to a Quonset Hut. It is open at the bottom."

Mrs. Hassell and Dr. Hargis described a heat cradle in about the same manner. Heat cradles are standard equipment and may be bought most anywhere from concerns handling pharmaceutical and medical supplies. The so-called improvised heat cradle used in the treatment of plaintiff consisted of a metal frame, similar to that described, and a goose-neck lamp set on the floor at the foot of plaintiff's bed with the neck bent and extended inside the metal frame. The frame was covered with a sheet.

On the night of February 5 and 6 in the neighborhood of midnight one of four other patients occupying the ward with plaintiff complained to the nurse on duty the light from the heat cradle was bothering him and requested it be covered with something to exclude the light. The nurse tossed a blanket over it, and there is evidence to the effect the light under the cradle was never turned off or on or otherwise given attention until about 7 A.M. when the day nurse came on and discovered plaintiff's burns.

The goose-neck lamp used was described with respect to the length of the neck which protruded into and under the cradle and one that showed considerable use and a somewhat flexible neck. The inference is the blanket in some way weighted the lamp down or knocked it over and against plaintiff's foot. The description of a standard heat cradle indicates the lamp bulb or heated metal would not and could not have come in contact with plaintiff's foot unless upset and turned onto a side or top.

There seems to be no point made but that the findings of the jury, supra, would convict a private hospital operated for profit of negligence, and that the evidence is sufficient to support the findings, but the contention is there is no liability, notwithstanding the facts and findings, because of the charitable immunity. It is our conclusion the findings do establish negligence and that they have support in the evidence. The point to be determined, however, is whether or not the defendant is exempt as claimed by it. It is the well-settled law of this State a charity corporation is not liable either to a beneficiary of or a stranger to the charity for the negligence of its agents and servants, provided it is not negligent in the hiring or retention of such agents and servants whose negligence proximately causes the injuries; and that such corporation is liable to its employees and third persons for injuries inflicted by the negligence of its managers, officers, vice-principals and agents in the conduct of the institution. S. M. U. v. Clayton, supra, and St. Paul's Sanitarium v. Williamson, Tex.Civ.App., 164 S.W. 36, e. r. It seems it must follow as a matter of course a hospital is liable to a patient for the failure to provide proper and safe instrumentalities for the treatment of ailments it undertakes to treat, because such is in the conduct of the institution. The agents and servants do not supply the instrumentalities. It is the institution that does that. Of course, it may not be said it must undertake to treat every ailment that comes but when it undertakes the treatment then it is incumbent upon it to supply suitable and safe appliances and instrumentalities. The ordinary patient submits himself without knowledge and without question of what may be proper and necessary. Such seems to be the conclusion reached by courts in other states holding as do our courts as above indicated. We cite the authorities found in appellee's brief, Tochetti v. Cyril & Julia C. Johnson Memorial Hospital, 130 Conn. 623, 36 A.2d 381; De Groot v. Edison Institute, 306 Mich. 339, 10 N.W.2d 907, 909, wherein it is said: "The law is well settled in this State that a charitable institution is not liable to a beneficiary for the torts of its servants, unless it was negligent in the selection and retention of the employees and the instrumentalities used by it in carrying

on and furthering its benevolent purposes." Fields v. Mountainside Hospital, 35 A.2d 701, at page 704, 22 N.J.Misc. 72, wherein the Court says: "It is administrative and is a nondelegable duty on the part of the hospital to employ a capable staff and for the breach of this duty, the institution may be liable. It is an administrative duty on the part of the hospital to supply proper equipment for the care of the patient," and quotes from an authority. To the same effect is Miller v. Sisters of St. Francis, 5 Wash.2d 204, 105 P.2d 32, 35, wherein the Court says: "A hospital, even though it be a charitable institution such as the one involved in this case, is liable for failure to furnish proper equipment if damages result from that failure." and quotes from a text in support thereof. See also Evans v. Lawrence & Memorial Hospital's Inc., 133 Conn. 311, 50 A.2d 443; Greenberg v. Society of Hillside Hospital, Sup., 73 N.Y. S.2d 21; Volk v. City of N. Y., 284 N.Y. 279, 30 N.E.2d 596, and McInermy v. St. Lukes Hospital Ass'n, 122 Minn. 10, 141 N.W. 837, 46 L.R.A.,N.S., 548.

It is said in 14 C.J.S., Charities, p. 551, § 75b, under the heading "Nondelegable duties": "A charitable hospital may be liable for its own neglect of duty, as distinguished from the negligence of its servants", and cites an example of its failure to exercise due care in the selection of physicians, nurses, attendants, or other agents and employees. It seems altogether illogical to hold a hospital liable for its negligence in the selection of its agents and servants and conclude it is not liable for its negligence in the selection and supplying of instrumentalities with which to treat patients whom it undertakes to treat.

We think there is nothing in S. M. U. v. Clayton, supra, contrary to our conclusions here reached. In that case one L. B. Morgan was employed by the University to supervise, among other things, the football field, which included the erection of temporary bleachers when it was expected the permanent seats would not accommodate all the spectators. That was a case of negligence of an employee in the discharge of his duties. As said there the wrong was not without a remedy in that recourse might be had against the actual wrongdoer. In the instant case the wrong did not flow from the negligent performance of a duty on the part of an employee but in the failure on the part of the hospital to supply a proper and safe heat cradle. There is no redress against any except the hospital, the actual wrongdoer. The case of Scott v. Rice, supra, was placed upon the same ground the Clayton case rests on and the Clayton case was made to control it altogether.

It would benefit neither the parties to this suit nor anyone else to enter upon a discussion of the several matters involved in the effort to fix liability on the defendant, or to avoid it, because of the destruction of the claimed immunity, which have nothing whatever to do with the presentation and determination of this issue just discussed. We therefore, forego any discussion of that matter and conclude with the last point wherein it is asserted the verdict is excessive.

The amount of the verdict, as heretofore stated, is $5,500.00. At the time plaintiff entered the hospital for treatment he had no feeling in his foot. The doctor described the burn on the great toe as a third degree one, which he explained means the burn goes through the skin and into the flesh, and they vary according to depth. The burn in this instance was about one-quarter of an inch, "or maybe a little more." The burn on the other two toes was a second-degree burn, which means a reddening of the skin with white spots. The big toe ultimately sloughed a portion of the skin and flesh. As we have already noted, plaintiff had but the one leg, and had been cautioned by his physician to be very careful to protect it. After the burn plaintiff had some fever for a few days and his diabetes was aggravated some and the insulin was stepped up. The doctor estimated his patient would have been ready for discharge from the hospital about March 1st, but he was not discharged until May 26. Most of his treatments were for the burns. He had some gangrene after the burn, which was not the infected type.

There is evidence plaintiff did not eat and sleep well after his burn. He had lost his other leg as the result of gangrene.

Plaintiff testified he lay awake at nights and wondered and pondered the ultimate results to his only leg and was worried and concerned over the possibility of losing it and becoming a total cripple. This possibility was not banished from his mind until the lapse of some four or five months. While he did not have the sensation of pain in his foot he did have some in his ankle and when he hung it off the side of the bed his foot and ankle would swell and remain that way for 20 to 30 minutes after he resumed his position on the bed. Plaintiff testified he was nervous, had sweats, (which the doctor could not attribute altogether to this burn and conditions resulting therefrom), was shaky and weak.

Plaintiff paid the doctor for all services rendered for the whole time $375.00 and the hospital $652.22, a total of $1027.22 and was billed for an additional sum of $147.00 which he did not pay.

Plaintiff recovered for, and the jury were instructed to consider only the mental and physical pain suffered from February 6 to May 26 as a proximate result of the accident, and the necessary and reasonable doctor and hospital bills incurred in the treatment of the injuries resulting from the burn, and were directed not to consider any physical and mental pain and suffering resulting from any injury or disease which plaintiff may have had prior to February 6, 1947.

As has been said many times each such case must be determined on its own facts and the only guide to be followed is the intelligence and conscience of the jury, and the amount to be awarded largely rests in the sound and intelligent discretion of the jury. Some things can not be measured by a money value, and while physical and mental pain and suffering is compensable, it is very difficult to measure and ascertain. What amount will compensate for it is very difficult to fix. The amount fixed by the jury will not be disturbed unless so excessive as to indicate prejudice, passion or partiality, or some like consideration which has led them to a disregard of justice. There is nothing of that sort suggested in this case. However, the minimum awarded for physical and mental pain and suffering is in round figures $4,500.00. The amount was fixed by the jury and approved by the trial court as fair and reasonable from an advantageous, close-up, first-hand view of the whole situation, and we are loath to disturb it, though we decline to do so with considerable hesitation.

For the reasons heretofore indicated we find sufficient support for the judgment in the record and no reversible error, and the judgment is accordingly affirmed.