**Ruby MULLIKIN, Administratrix of the Estate of Jacob Albert Demaree, Appellant,**

v.

**JEWISH HOSPITAL ASSOCIATION OF LOUISVILLE, Kentucky, Appellee.**

Court of Appeals of Kentucky.

May 5, 1961.

Rehearing Denied Sept. 29, 1961.

Fred J. Karem, Karem & Karem, Louisville, for appellant.

J. Donald Dinning, McElwain, Dinning, Clarke & Winstead, Louisville, for appellee.

BIRD, Chief Justice.

Jacob Albert Demaree was a patient in appellee's hospital. It is alleged in this action that he died from injuries received when he fell from his hospital bed. It is charged that these injuries resulted from the negligence of the hospital, its agents, servants and employees.

In answer to the charges of negligence the operators of the hospital first asserted that the complaint failed to state a claim upon which relief can be granted. Secondly, the allegations of negligence were denied in toto.

The third defense is as follows:

"Defendant is and was at all times herein mentioned, a non-stock, non-profit corporation organized under the laws of Kentucky purely for charitable purposes, and no one derives any pecuniary or other profit or gain from its operations, and defendant is not and cannot be under any liability to plaintiff on account of any alleged negligence of itself, its agents, servants or employees."

A motion to strike the third defense was overruled. The complaint was dismissed when claimant declined to plead further. Thus this appeal.

There is only one question to be answered on this appeal. Is the quoted third defense a valid one? We have long held that it is and have gone so far as to say that any change in the rule should be made by the legislature. Forrest v. Red Cross Hospital, Ky., 265 S.W.2d 80. This Court has for years been asked to reappraise the predicates of our doctrine of immunity. Despite our repeated declarations of immunity these actions continue to come to this Court on appeal. We cannot charge this to the attorneys' ignorance of our decisions. The claimants' lawyers have been quite candid with the Court. They have consistently pointed to the law as it

is written but they have just as consistently argued that the rule has lost its predicate. The learned trial judge ruled in exact conformity with the case law of this state but we have nevertheless concluded to take another look.

Much has been written about the tort immunity of charitable institutions but it seems that the late Justice Gus Thomas covered the Kentucky position rather well in Cook v. John N. Norton Memorial Infirmary, 180 Ky. 331, 202 S.W. 874, 875. There we stated our position as follows:

"An examination of the authorities has convinced us that a purely charitable institution, such as defendant's hospital is described in the pleadings to be, is not amenable to its patients, although paid ones, for any damages which they may have sustained growing out of alleged negligence, although such negligence might consist in the violation by the hospital of some duty imposed either by an express or an implied contract. The cases dealing with the subject seem to treat the cause of action as one sounding in tort, although the liability, if any, was created by the negligent failure on the part of the hospital to observe some alleged contractual duty, which is analogous to the rule applied to common carriers in suits by their passengers who sustain contractual relations the one with the other, although the suit is generally treated as one sounding in tort. Bearing this in mind, we find the rule whereby such institutions are absolved from liability thus stated in 13 R.C.L. p. 945:

"'Immunity in all cases of tort has been claimed for them on the following grounds: (1) Public policy; (2) that the assets or funds of the institution are impressed with a trust for charitable purposes and may not be diverted to other use; (3) that in so far as concerns patients voluntarily entering, whether as pay or as charity patients,

they impliedly waive all claim for injuries and assume the risk therof.'
* * *

"The first ground found in the excerpt from R.C.L. supra—that of public policy—upon which a number of courts base their opinions holding the defendant in this character of case not liable, is upon the theory that such institutions are inspired and supported by benevolences and devote their assets and all their energies to the relief of the destitute, the sick, and the needy, and that the common welfare requires that they should be encouraged in every way and be exempt from liability from this character of action; that, if it should be otherwise held, it would operate to discharge the charitably inclined from donating or founding such institutions and might utterly destroy them, thus indirectly casting the burden of doing so upon the state.
* * *

"The trust fund doctrine proceeds upon the idea that the trust created by the founders of the institution as augmented by receipts from pay patients constitutes a charitable trust fund, and that, if it should be diverted to the payment of judgments which might be obtained in damage suits against the institution, the purposes of the charity, as well as its donors, would be frustrated, and the charity itself most likely eventually destroyed, and that such a result was never contemplated by the founders or those who in any manner donated to the institution.
* * *

"The theory of the 'implied waiver' doctrine is that one who accepts the benefits, accommodations, and services of such an institution enters into a relation with it whereby he agrees to exempt it from liability for the negligence of any of its servants in administering the charity, and that the patient thereby assumes the risk grow-

ing out of any negligent act of any of those connected with administering the affairs of the institution. * * *

"While not called upon to take a position relative to the merits or demerits of all of the three respective theories above referred to as grounds for excusing the institution from liability in this character of case (although the first and second ones have been adopted by this court, as we shall see), we are not averse to saying that each of them to our minds is founded upon sound logic and convincing reasoning, * * *."

In approving the three grounds for immunity our Court asserted that each of them "is founded upon sound logic and convincing reasoning." Though we have continued to follow the rule of immunity there has been much debate concerning the accuracy of this statement. It is here, we think, that right and expediency met in combat, expediency emerging as victor. Only from a premise of expediency could reason lead to such a conclusion as reached in Cook v. John N. Norton Memorial Infirmary, supra, and other cases with like holdings. It has not been right, is not now right, nor could it ever be right for the law to forgive any person or any association of persons for wronging any other person. Forgiveness is the prerogative of the Lord and of the person against whom the wrong is done or upon whom the injury has been inflicted. Criminal law sometimes provides that the chief executive or other representative of the state may pardon a person for his wrong against organized society but nowhere does the criminal law immunize any person or group of persons against punishment for violation of the criminal laws if those persons are capable of acting wilfully. The general rule of civil law, and the correct rule, is that those capable of doing negligent acts must answer in damages for injuries done by those acts. When there is negligence the rule is liability. Immunity is an exception. The rule is that charity is no defense to tort. Immunity of charitable institutions such as we have in this case is indeed an exception which seems to have crept into our law under the pressure of expediency. Upon applying the simple test of right and wrong we are forced to the conclusion that the charitable nature of a wrongdoer should create no exception to the rule of liability. Nor is there any reason under the rule of right why the principle of respondeat superior should not apply.

This jurisdiction has not been alone in its waywardness. Many state jurisdictions have, upon the same or part of the same grounds, adopted the doctrine of charitable immunity. Many of those same jurisdictions have reversed these holdings. In so doing some have said substantially that reason did not support the position originally taken while others have sought to explain the change of position by pointing out the differences of today and yesterday.

Let us look at Parker v. Port Huron Hospital, 361 Mich. 1, 105 N.W.2d 1, 12. There it was said as follows:

"The immunity rule arose at a period in our society's development when charity typically operated on a small scale. Most gifts to charity were private, not corporate. Charitable needs were always poorly satisfied. It made sense in that period to hold that all gifts to charity should go to the purposes for which they were given, and not to outsiders who were by accident injured in the administration of the charity. This was a deliberate choice, designed to encourage gifts to charity by assuring the giver that his gift would be used as he intended.

"Today charity is big business. It often is corporate both in the iden-

tity of the donor and in the identity of the donee who administers the charity. Tax deductions sometimes make it actually profitable for donors to give to charity. Organized corporate charity takes over large areas of social activity which otherwise would have to be handled by government, or even by private business. Charity today is a large-scale operation with salaries, costs and other expenses similar to business generally. It makes sense to say that this kind of charity should pay its own way, not only as to its office expenses but as to the expense of insurance to pay for torts as well.

"The old rule of charitable immunity was justified in its time, on its own facts. Today we have a new set of facts. It is true that the new facts are still described by the same word in our English language— 'charities'—but that is because our language has not changed as the facts of our life have changed. We have new facts described by old nomenclature. To say that the old rule of law still applies is to reach a result on the basis of nomenclature, not of facts; it is to apply a rule, proper in its time, to completely new facts, and to justify doing so by reference to language merely without regard to the facts.

"It is our conclusion that there is today no factual justification for immunity in a case such as this, and that principles of law, logic and intrinsic justice demand that the mantle of immunity be withdrawn. The almost unanimous view expressed in the recent decisions of our sister States is that insofar as the rule of immunity was ever justified, changed conditions have rendered the rule no longer necessary.

"Since 1942, the year in which President and Directors of George-

town College v. Hughes, supra, was decided, the following jurisdictions have abolished whatever immunity rule they previously had: Alaska; Arizona; California; Delaware; Idaho; Iowa; Kansas; Minnesota; Mississippi; New Hampshire; North Dakota; New Jersey; New York; Ohio; Puerto Rico; Vermont; and Washington. Today these and most of the other States of the nation, having abolished the immunity rule, are now governed by the general doctrine of respondeat superior as far as liability for torts of employees and agents of charitable corporations are concerned."

We direct your attention to the footnotes in Parker v. Port Huron Hospital for the authorities supporting the quote.

The Parker case followed generally the holding in President and Directors of Georgetown College v. Hughes, 76 U.S.App.D.C. 123, 130 F.2d 810, 812. In that case the various theories of immunity and the extent to which they have been accepted or rejected have been documented. Each theory appears to have been exhaustively criticized and we refer the bench and bar to that opinion and to its footnotes for other authorities. We will not undertake to quote the criticism directed to each theory of immunity. We will however quote a portion of the reasoning in that case and general criticism of the theories of immunity:

"We start with general principles. For negligent or tortious conduct liability is the rule. Immunity is the exception. Human beings ordinarily are responsible for their own legally careless action. They respond also for negligent harms inflicted by their agents and employees. So do business corporations. Likewise trustees and other fiduciaries generally are liable for their own negligence in administration and operation of the

business or property committed to their control. Respondeat superior more and more has made them, as it has private corporations, responsible for wrongs done by their inferior functionaries.

"Generally also charity is no defense to tort. For wrong done, it is no answer ordinarily to say, 'He did not pay and was not bound to pay for the service. I gave it to him.' One who undertakes to aid another must do so with due care. Whether the Good Samaritan rides an ass, a Cadillac, or picks up hitchhikers in a Model T, he must ride with forethought and caution. He is not relieved because it is his driver rather than himself who lapses into carelessness. Nor does it matter that the doer of good is a corporation, if the act of gratuitous service is fairly incidental to the business. Railroad companies, through their employees, may and often do undertake to do more for the passenger than the strict bargain or duty of carriage requires. But if they depart from normal conduct in doing it, they pay for the deviation. * * * Charity suffereth long and is kind, but in the common law it cannot be careless. When it is, it ceases to be kindness and becomes actionable wrongdoing. * * *

"When an individual human being undertakes not simply an isolated act, but a habit or business of charity, without incorporating or casting it in the form of a trust, he does not acquire immunity. Possibly half the medical service rendered today is charity practice. So is a large share of legal service. Some physicians, and perhaps some lawyers, spend half or more of long and useful careers ministering to the sick and the troubled without pay. Many more do so habitually, but less extensively. Yet they do not have leave to be careless, notwithstanding their kindness is continuous or habitual rather than casual or occasional. Nor would they if it were conducted through or in association with others. Only when an individual institutionalizes his charitable enterprise formally, as by incorporation or possibly by creating a trust, does he succeed in casting the whole burden of its negligent operation on those it injures.

"It is a strange distinction, between a charitable institution and a charitable individual, relieving the one, holding the other, for like service and like lapse in like circumstances. The hospital may maim or kill the charity patient by negligence, yet the member of its medical staff, operating or attending without pay or thought of it, dare not lapse in a tired or hurried moment. Cf. Bonner v. Moran, 1941, 75 U.S.App.D.C. 156, 126 F.2d 121 [139 A.L.R. 1366]; Christie v. Callahan, 1941, 75 U.S.App. D.C. 133, 124 F.2d 825. The institution goes free. The physician pays. Yet they render a common service, which the hospital could not furnish without him. The physician cannot incorporate. He cannot shield himself behind a trust. He cannot escape respondeat superior. His partner answers if he does. Cf. Christie v. Callahan, supra. So it is with the lawyer.

"The basis of the distinction cannot be charity. It cannot be habit or continuity in charity. If it were either, individuals would be free upon proof of the fact, or institutions would be liable upon proof of the contrary in the particular instance. The distinction reverses the general trend of responsibility in a risk-sharing and distributing age. Institutions have a survival value no individual possesses. They withstand

vicissitudes individuals cannot meet. It is probable that charitable ones resist demise more stoutly than business ones. Certainly they incur no greater risks. If charity should exempt either institutions or individuals, it should be the latter. But there should be no distinction. Unless motive is to replace duty, both should be liable and liable alike. Institutions should shoulder the responsibilities all other citizens bear. They should minister as others do, within the obligation not to injure through carelessness.

"Nor should the legal form in which the charitable institution is cast create immunity. It is not altogether clear that it does, except possibly when the corporate form is used. Unless the normal law of trusts is modified, the trustee must go down in his pocket as other trustees do, though he cannot dip into the fund. But when the charity is incorporated, somehow charity plus incorporation creates a certainty of immunity neither can attain apart from the other. Because the directors do not hold the legal title to the corporate property and therefore are not 'principals' as trustees are, though they have all the latters' control and more, there is no personal liability of the ultimately responsible management except when its members participate personally in the negligent action. When charity is incorporated, therefore, it takes on a cloak of immunity not granted it in other guises, and not granted in that guise to other activities. * * *

"It is hardly necessary to discuss the various theories of exemption or their application in various modifications. Whether immunity be founded on the 'trust fund' theory, the rule of respondeat superior, so-called 'public policy,' or the more indefensible doctrine of 'implied waiver,' is not for us a controlling consideration. At bottom, except possibly for the last, these come down to the same thing, supported by the same considerations. They are merely different names for the same idea, cast according to the predilection of the user for technical or for broader terminology. The 'trust fund theory' comprehends all that is involved in 'public policy,' with only an apparent difference in approach. This is true likewise of 'respondeat superior' and 'implied waiver.' In any event the result is a departure from general, and we think right, principles of liability. The differences in foundation do not affect even the extent of the departure. We think it should be complete and that charitable corporations should respond as others do for the wrongs inflicted by persons who act in their behalf about their business and within the course of their duties, actual or apparent. Immunity, whether full or partial, is to be granted only when compelling reason requires it. If there has been, there is no longer such reason. The reasons which support governmental immunity, where it remains, are largely different, but even so they too give way gradually to liability imposed or permitted by legislation."

 We are impelled by right and reason to reverse our previous holdings and hold that the charitable nature of an institution is not sufficient within itself to give immunity from liability for its tort. The principle of respondeat superior shall hereafter be applied as in other tort actions. Though other jurisdictions have done it we think it unwise to distinguish between paying patients, non-paying patients and other persons who may be negligently injured.

In conclusion we shall use the final words in the Georgetown case: [76 U. S.App.D.C. 123, 130 F.2d 827]

"In taking this view we are not unmindful that charitable institutions perform a high service in the community. In days when the state was less mindful of individual need, they gave a helping hand not otherwise held out to large numbers of people. They still do so. They recently have faced, and still face grave problems. Purse strings no longer are loose, as they were before world wars and world-wide depressions. But individuals and business institutions face similar uncertainties. It does not recompense injured persons that the loss is inflicted by charitable institutions, nor should they alone bear it because all together face a hard future. For reasons already stated we do not believe the survival of charities will turn on whether or not they must answer for their wrongs to persons they are formed to help. There may be some added expense of operation. It may be no more than the cost of litigating these claims over and over, for the issue will not down. Insurance must be carried to guard against liability to strangers. Adding beneficiaries cannot greatly increase the risk or the premium. This slight additional expense cannot have the consequences so frequently feared in judicial circles, but so little realized in experience. To offset the expense will be the gains of eliminating another area of what has been called 'protected negligence' and the anomaly that the institutional doer of good asks exemption from responsibility for its wrong, though all others must pay. The incorporated charity should respond as do private individuals, business corporations and others, when it does good in the wrong way."

For the reasons given the judgment is reversed for proceedings not inconsistent with this opinion.

STEWART, J., dissenting.