BALL MEMORIAL HOSPITAL *v.* FREEMAN.

[No. 30,318.   Filed February 19, 1964.   Dissenting opinion
filed February 21, 1964.]

*Marshall E. Hanley, Bracken, De Fur, Voran & Hanley,* of Muncie, *William R. Hunter,* and *Mendenhall, Hunter & Stohler,* of Winchester, for appellant.

*Frank E. Gilkison, Jr., White, Haymond, Pierce & Beasley,* of Muncie, *John E. Bales,* and *Wilson & Bales,* of Winchester, for appellee.

LANDIS, C. J.—This was an action against appellant-hospital, a charitable corporation, for personal injuries received by appellee while a patient at such hospital. Appellee recovered a judgment upon a jury's verdict in the amount of $7,500.00.

Appellant's first contention on this appeal is that

appellant-hospital being a charitable corporation, could not be liable for the negligence alleged in this case.

Appellee's complaint alleged in substance that appellee as a paying out-patient was operated upon in appellant-hospital to have a loose cartilege removed from a joint of his left thumb. That in the course of said operation there was injected into appellee's left thumb by the surgeon a fluid appellant had prepared, placed in a container, and labeled as novocaine anesthetic, which appellant had delivered to appellee with knowledge the fluid would be used by appellee as a novocaine anesthetic and injected into his body. That the fluid was not a novocaine anesthetic, but was a poisonous and deleterious fluid, the composition of which was known to appellant but not to appellee. That said fluid was prepared, placed in a container and labeled by an employee of appellant, one Ruth Rossi. That said fluid was delivered to appellee by an employee of appellant. That said fluid caused great pain and swelling to appellee's left hand and arm and caused an ulcer at the base of appellee's left thumb necessitating skin graft operations upon appellee, and the removal of a nerve. That as a result, appellee sustained permanent scars and impairment to specified parts of his body and also medical expense and loss of earnings.

It was further alleged the injuries to appellee were proximately caused by appellant's negligence in improperly arranging the method or system for the preparation and dispensing of novocaine solution so as to see that the preparation dispensed to the surgeon for appellee was in fact novocaine.

Wherefore appellee demanded judgment for $25,000 damages, etc.

Appellee contends that since, under prior decisions of this state and elsewhere, a charitable corporation has been held liable for a failure to exercise due care in the selection of its employees as a result of which injury or damage has occurred, that similarly a charitable hospital corporation is liable for negligence in failing to employ proper instrumentalities and facilities in the preparation, bottling and dispensing of drugs as a result of which injury to patients has occurred.

We believe appellee's position to be well taken, and note that it is generally supported by numerous authorities from other jurisdictions irrespective of whether such jurisdictions follow an immunity rule as to the liability of charitable corporations for torts. See: *Volk* v. *City of New York* (1940), 284 N. Y. 279, 30 N. E. 2d 596; *Holtfoth* v. *Rochester Gen. Hosp.* (1952), 304 N. Y. 27, 105 N. E. 2d 610, 612, 31 A. L. R. 2d 1113; *Medical and Surgical Memorial Hospital* v. *Cauthorn* (1950, Texas Civ. App.), 229 S. W. 2d 932; *Evans* v. *Lawrence & Memorial Associated Hospitals* (1946), 133 Conn. 311, 50 A. 2d 443; *Fields* v. *The Mountainside Hospital* (1944), 22 N. J. Misc. 72, 35 A. 2d 701; *Clampett* v. *Sisters of Charity* (1943), 17 Wash. 2d 652, 136 P. 2d 729.

In *Volk* v. *City of New York, supra,* plaintiff was a patient in defendant-hospital and was treated with decomposed morphine solution, causing the loss of use of an arm. Plaintiff charged the defendant with corporate or administrative negligence in making available decomposed medical supplies. The supervisor knew the decomposed morphine was among the medical supplies and that it was not to be used, but did nothing. The Court of Appeals of New York held the defendant-charitable corporation liable for negligence in the performance

of an administrative duty in failing to have a fresh morphine solution available.

Similarly, in *Medical and Surgical Memorial Hospital* v. *Cauthorn, supra,* the plaintiff recovered a jury verdict for the negligence of the defendant-charitable corporation in furnishing a defective heat cradle or lamp. In affirming the judgment of the trial court the Texas Court of Civil Appeals, after recognizing that a charitable corporation may be liable for negligence in hiring or retention of employees, said at p. 934 of 229 S. W. 2d:

> " . . . It seems it must follow as a matter of course a hospital is liable to a patient for the failure to provide proper and safe instrumentalities for the treatment of ailments it undertakes to treat, because such is in the conduct of the institution. The agents and servants do not supply the instrumentalities. It is the institution that does that. Of course, it may not be said it must undertake to treat every ailment that comes but when it undertakes the treatment then it is incumbent upon it to supply suitable and safe applicances and instrumentalities. The ordinary patient submits himself without knowledge and without question of what may be proper and necessary. Such seems to be the conclusion reached by courts in other states holding as do our courts as above indicated. . . . "

Appellant has further complained of error in the giving of instruction No. 11 which was as follows:

> "When an accident happens, resulting in injury to a person, where it appears that the instrumentalities that caused it were unknown to such person and were under the exclusive control or management of the defendant, and the accident is such that under the ordinary course of things it would not occur if those who have control and management used reasonable and ordinary care, then, in the absence of evidence to the contrary, this would be evidence that the accident occurred

from the lack of reasonable and ordinary care. In such case the happening of the accident creates the presumption of negligence; on the face of it, it makes a case for the plaintiff because the thing is said to speak for itself. The defendant may then come forward with evidence to show that notwithstanding such presumption against him, the thing was not in fact caused by his negligence. Then the jury must weigh all the evidence on the subject, and finally determine whether the plaintiff has proved the negligence alleged in the complaint by the preponderance of the evidence."

Appellant contends this instruction was based upon the theory of res ipsa loquitur and was erroneously given as the rule of res ipsa loquitur was not applicable under the facts of this case, citing: *Prest-O-Lite Co.* v. *Skeel* (1914), 182 Ind. 593, 599, 106 N. E. 365, 367, Ann. Cases 17A, 474, 476; *Union Traction Co.* v. *Mann* (1919), 72 Ind. App. 50, 124 N. E. 510.

It is apparent to us, however, that the facts in the cited cases are entirely distinguishable from the case at bar.

In *Prest-O-Lite,* plaintiff was a workman employed by a contractor to build a building pursuant to plans and specifications prepared by an architect employed by the owner. The building collapsed during the process of construction, and plaintiff brought suit against the owner. It was clear in that case that the defendant owner did not have control over the construction of the building by plaintiff's employer, and that the circumstances did not indicate that in the ordinary experience of mankind the accident would not have happened unless the defendant had been negligent. The court therefore properly held res ipsa loquitur was not applicable. Similarly, in *Union Traction,* plaintiff was a passenger in a street car which was stopped and was struck from

behind by a car operated by another company, but plaintiff brought suit against the company operating the car in which she was a passenger. There being no state of facts in such case which suggested plaintiff's carrier appeared to have been negligent, the doctrine obviously did not apply.

In the case before us, the instrumentality which injured appellee was the solution prepared, stored and dispensed by appellant and delivered by it to appellee. It was not the procaine hydrochloride (novocaine) crystals (salt) which injured appellee, but rather the solution of which such crystals were only a part. Appellant, after obtaining such novocaine crystals from a commercial drug company, *assumed complete dominion and control over them,* and in fact changed their nature entirely by the manufacturing process of putting them into solution in various proportions with a saline solution, also prepared by appellant. The mere fact that the various ingredients of the solution, including the regular salt, the water, and the bottles, caps and tags used, as well as the procaine salt (novocaine) were purchased from someone else is insignificant when, according to the uncontradicted evidence, it is shown that appellant took these various components and by its own process changed their nature entirely and produced the commodity which caused the injury to appellee.

In fact if res ipsa loquitur did not apply to the case at bar it would be difficult to understand the basis of the landmark case of *Byrne* v. *Boadle* (1863), 2 H & C 722, 159 Eng. Reprint 299, which involved the barrel rolling out of the upper window of defendant's place of business and gave birth to the doctrine of res ipsa loquitur.

Appellant's own evidence in the present case negated any inference there was anything wrong with the *pur-*

*chased* crystals. The hospital pharmacist who testified for appellant stated the procaine crystals were purchased in five pound packages, lasting about one year. The evidence further showed eight instances of injuries from the novocaine solution within a two week period in June and July of 1953. If the crystals purchased by appellant-hospital had been noxious, it would seem the same would have been evident up to a year earlier if the crystals from which the solution was made were the last of a five pound box, or if the box had been opened subsequently it would appear there would have been later complaints as to the solution, but no subsequent injuries appear to have occurred.

The only logical deduction from the evidence is that appellant was negligent with regard to the particular system it maintained for the preparation, storage and dispensing of the solution. Here the instrumentalities for injecting the solution, the syringe, the needle, and other equipment were furnished by appellant. The surgeon administering the solution to appellee did nothing to change its character and was merely a conduit to assure that it reached appellee in the place and manner intended. There was no allergic reaction to the novocaine solution in this case.

Appellant had complete control over the solution until it was given to appellee in the manner appellant intended, and the uncontradicted evidence negates any suggestion that the injuries were caused by someone else. This leaves but one inference, that appellant was guilty of negligence.

That this Court is further committed to the application of res ipsa loquitur in cases such as the case at bar is evident from our recent opinion in *New York, Chi., etc., R. R. Co.* v. *Henderson* (1958), 237 Ind. 456, 146 N. E. 2d 531, 147 N. E. 2d 237 (opinion by Judge

Arterburn in which Judges Achor and Landis concurred, and a further concurring opinion by Judge Emmert). In such case it should be noted that we stated (at p. 463 of 237 Ind., and p. 536 of 146 N. E. 2d):

> " . . . Since then [the *Byrne* v. *Boadle* decision] the doctrine has been applied to train derailment cases, falling objects, *surgical and dental operations and treatment resulting in unusual injuries,* and failure of mechanical devices within the exclusive control of the defendant, among various other sets of facts. As complicated mechanical devices of our modern age achieve greater perfection and greater reliance upon them is justified, it follows that the doctrine has a broader application than originally."[1] (Emphasis added.) See also: *Knoefel* v. *Atkins* (1907), 40 Ind. App. 428, 81 N. E. 600; *Cleveland, etc., R. Co.* v. *Hadley* (1908), 170 Ind. 204, 82 N. E. 1025, 16 L. R. A. (N. S.) 527, 16 Ann. Cases 1; *Kickels* v. *Fein* (1937), 104 Ind. App. 606, 10 N. E. 2d 297; *Sweeney* v. *Erving* (1913), 228 U. S. 233, 240, 33 S. Ct. 416, 57 L. ed. 815, 819.[2]

---

1. The use of automation devices in modern hospitals such as for monitoring patient's temperature, pulse and respiration is today an accomplished fact. According to a recent study a vast number of electronic devices can be expected to continually release the nurses from drudgery and make more efficient the hospital.
See: Study of Dr. Mark S. Blumberg, senior health economist of Stanford Research Institute.

2. In the *Sweeney* case appears an oft-cited definition of res ipsa loquitur, viz:
"In our opinion, res ipsa loquitur means that the facts of the occurrence warrant the inference of negligence, not that they compel such an inference; that they furnish circumstantial evidence of negligence where direct evidence of it may be lacking, but it is evidence to be weighed, not necessarily to be accepted as sufficient; that they call for explanation or rebuttal, not necessarily that they require it; that they make a case to be decided by the jury, not that they forestall the verdict. Res ipsa loquitur, where it applies, does not convert the defendant's general issue into an affirmative defense. When all the evidence is in, the question for the jury is whether the preponderance is with the plaintiff." *Sweeney* v. *Erving* (1913), 228 U. S. 233, 240, 33 S. Ct. 416, 57 L. ed. 815, 819.

In our judgment the facts here made out a case of res ipsa loquitur and appellant's objection to the ■ giving of the instruction in question is therefore not well taken.

Although it is not necessary to a determination of this case, appellant and appellee have devoted considerable argument in their briefs to the question of charitable immunity in view of the fact that appellant-hospital was a charitable corporation and under such doctrine would not generally be liable for its negligence in causing injury to patients. Appellant argues for the doctrine of charitable immunity, while appellee points out that in thirty-two jurisdictions in this country,[3] the doctrine has now been repudiated and in still other states remedial legislation has been enacted.

3. See: *Tucker* v. *Mobile Infirmary Association* (1915), 191 Ala. 572, 68 So. 4, L.R.A. 1915D 1167; *Moats* v. *Sisters of Charity of Providence* (1952), 13 Alaska 546; *Ray* v. *Tuscon Medical Center* (1951), 72 Ariz. 22, 230 P. 2d 220; *Malloy* v. *Fong* (1951), 37 Cal. 2d 356, 232 P. 2d 241; *O'Connor* v. *Boulder Assn.* (1939), 105 Colo. 259, 96 P. 2d 835, 133 A.L.R. 819; *Durney* v. *St. Francis Hosp.* (1951), 46 Del. 350, 83 A. 2d 753; *President and Directors of Georgetown College* v. *Hughes* (1942), 76 App. D. C. 123, 130 F. 2d 810; *Nicholson* v. *Good Samaritan Hospital* (1940), 145 Fla. 360, 199 So. 344, 133 A.L.R. 809; *Morton* v. *Savannah Hospital* (1918), 148 Ga. 438, 96 S. E. 887; *Wheat* v. *Idaho Falls Latter Day Saints Hospital* (1956), 78 Idaho 60, 297 P. 2d 1041; *Moore* v. *Moyle* (1950), 405 Ill. 555, 92 N. E. 2d 81; *Haynes* v. *Presbyterian Hosp. Assn.* (1950), 241 Iowa 1269, 45 N. W. 2d 151; *Noel* v. *Menninger Foundation* (1954), 175 Kans. 751, 267 P. 2d 934; *Mullikin* v. *Jewish Hospital Assn.* (Ky. 1961), 348 S. W. 2d 930; *Parker* v. *Port Huron Hospital* (1960), 361 Mich. 1, 105 N. W. 2d 1; *Mulliner* v. *Evangelischer, Diakonniessenverein* (1920), 144 Minn. 392, 175 N. W. 699; *Mississippi Baptist Hosp.* v. *Holmes* (1952), 214 Miss. 906, 55 So. 2d 142, 56 So. 2d 709, 25 A.L.R. 2d 12; *Howard* v. *Sisters of Charity of Leavenworth* (1961), U. S. D. C. Mont., 193 F. Supp. 191; *Welch* v. *Hospital* (1939), 90 N.H. 337, 9 A. 2d 761; *Callopy* v. *Newark Eye and Ear Infirmary* (1958), 27 N. J. 29, 141 A. 2d 276; *Bing* v. *Thunig* (1957), 2 N. Y. 2d 656, 143 N. E. 2d 3; *Rickbeil* v. *Grafton Deaconess Hospital* (1946), 74 N. D. 525, 23 N. W. 2d 247, 166 A.L.R. 99; *Avellone* v. *Hospital* (1956), 165 Ohio St. 467, 135 N. E. 2d 410; *Sisters of the Sorrowful Mother* v. *Zeidler* (1938), 183 Okla. 454, 82 P. 2d 996; *Hungerford* v. *Portland Sanatarium & Benev. Assn.* (1963), 235 Ore. 412, 384 P. 2d 1009; *Glavin* v. *Rhode Island Hospital* (1879), 12 R. I. 411, 34 Am. Rep. 675;

The legislature of this state has by statute dealt with some of the vexing problems of sovereign immunity of the State (the King can do no wrong concept)[4] by the passage of ch. 52 of the Acts of 1941 (Burns' §39-1818, 1952 Repl., *et seq.*), authorizing the purchase of liability insurance by instrumentalities of the state and limiting liability in such event to the amount of such insurance coverage.

While some of the wording contained in such statute indicates it is not a model of excellence in legislative draftsmanship, we believe legislation of this character should be encouraged to deal with the problem that exists in this area.

As heretofore indicated, in view of the result we have reached, it is not necessary to express any opinion as to whether the charitable immunity doctrine is or is not presently the law of this state.

The judgment of the lower court is affirmed.

Arterburn and Myers, JJ., concur; Achor, J., dissents with opinion; Jackson, J., dissents without opinion.

### DISSENTING OPINION

ACHOR, J.—I do not concur in the majority opinion for several reasons.

*One*: Although the majority opinion purports "not at this time to express any opinion as to whether the charitable immunity doctrine is or is not the law of this

---

*Vanderbilt University* v. *Henderson* (1938), 23 Tenn. App. 135, 127 S. W. 2d 284; *Sessions* v. *Thos. D. Dee Memorial Hospital Association* (1938), 94 Utah 460, 78 P. 2d 645; *Foster* v. *Roman Catholic Diocese* (1950), 116 Vt. 124, 70 A. 2d 230, 25 A.L.R. 2d 1; *Pierce* v. *Yakima Valley Etc., Ass'n.* (1953), 43 Wash. 2d 162, 260 P. 2d 765; *Kojis* v. *Doctor's Hospital* (1961), 12 Wis. 2d 367, 107 N. W. 2d 131, 107 N. W. 2d 292; *Taverez* v. *San Juan Lodge No. 972, B.P.O.E.* (1948), 68 Puerto Rico 681.

4. *State etc.* v. *Marion Cir. Ct.* (1958), 238 Ind. 637, 643, 153 N. E. 2d 327, 330.

state," as applied to charitable hospitals, it occurs to me that, under the facts stated in the majority opinion, it does, in effect, repudiate such doctrine.

*Two*: The majority opinion purports to support the decision therein upon the proposition of law that a charitable hospital corporation is liable for the negligence of persons in a managerial or supervisory capacity in failing to employ proper instrumentalities and facilities, as a result of which injury or damage occurs to a patient. However, the majority opinion cites no evidence of any negligence on the part of any person in a managerial or supervisory capacity with regard to such "instrumentalities and facilities," which are alleged to have resulted in injury to the patient. In fact, the evidence recited negates any negligence on the part of such persons. The negligence, if any, was in the preparation of the purported novocaine anesthetic, and this, the majority opinion states, "was prepared, placed in a container and labelled by an *employee* of appellant," and was delivered to the doctor for injection by another employee. [My emphasis.] In my opinion, these facts clearly distinguish the case at bar from those cited and relied upon in the majority opinion.

Upon this proposition, the majority opinion cites and quotes, with approval, from the case of *Medical and Surgical Memorial Hospital* v. *Cauthorn* (1950, Texas Civ. App.), 229 S. W. 2d 932. However, in that case the court clearly distinguished the circumstances under which a hospital, as distinguished from its agents and servants, would be held liable for negligence. The court stated:

" . . . [A] *hospital* is liable to a patient for the failure to provide proper and safe *instrumentalities* for the treatment of ailments it undertakes to treat, because such is in the conduct of the institu-

tion. *The agents and servants do not supply the instrumentalities.* It is the institution that does that.
. . . " [My emphasis.]

As previously noted, in the case at bar the majority opinion recites no evidence that anyone connected with the management of the hospital was negligent in either the procuring or processing of the novocaine, which is alleged to have injured the patient. To the contrary, it occurs to me that the only reasonable inference which may be drawn from the evidence is that, if there was negligence or error in the processing of the novocaine, such negligence or error was solely that of the "agents and servants" of the hospital, for which, under the prior decisions of this state, the institution itself is not liable.[1]

*Three*: My strongest objection to the majority opinion is that it not only affirms a judgment in damages against a charitable hospital for error or negligence, which is assumed to have existed on the part of the agents and servants of the hospital, the majority opinion resorts to an application of the doctrine of res ipsa loquitur to establish an inference or presumption that there was any negligence at all on the part of the hospital or its agents and servants. It is my opinion that the application of the doctrine, under the circumstances of the case, was error. And, further, I fail to comprehend how the doctrine of res ipsa loquitur can be applied without abrogating the charitable immunities doctrine, since under the doctrine of res ipsa loquitur no issue is contemplated as to whether the negligence presumed is that of an employee as distinguished from that of his respondeat superior.

---

1. *St. Vincent's Hospital* v. *Stine* (1924), 195 Ind. 350, 144 N. E. 537.

The limited facts and the certain scientific principles which were involved in the early English case of *Byrne* v. *Boadle* (1863), 2 H & C 722, 159 Eng. Reprint 299, cited in the majority opinion, wherein a barrel rolled out of an opening in the second floor of a building, is one thing; the operation of a hospital is quite another. The latter involves too many people of varying degrees of responsibility to the hospital, and too many human factors and frailties, which must be considered in the treatment of a patient in a hospital to warrant the application of the doctrine of res ipsa loquitur.[2]

The care and treatment of the patients involves first, and foremost, the doctor, over whom the hospital has very little control. There are interns, over whom the hospital may have more, but very little, control. There are nurses, upon whom the hospital must rely primarily for the care and treatment of the patients. Yet, the nurses are also under the control of the doctors whose patients are the patients of the hospital. Then, there are student nurses, nurses' aids, practical nurses, volunteers, orderlies, a varitable galaxy of human personalities of varying skills, upon whom the hospital must rely.

Consider the human errors which might reasonably result in the limited area of the communication between doctor and nurse, over which the hospital would

2. "The doctrine of res ipsa loquitur, which is recognized in almost all jurisdictions, is that, where the thing which caused an injury is shown to be under the management of defendant *or his servants* and the accident is such as in the ordinary course of things does not happen if those who have its management or control use proper care, it affords reasonable evidence, in the absence of explanation by defendant, that the accident arose from want of care." 65 C.J.S. §220(2), p. 987.

"As a general rule, the doctrine of res ipsa loquitur is inapplicable unless the management and control of the injuring agency were *exclusively* in the person charged at the time of the accident or, according to some authorities, at the time of the negligence." 65 C.J.S. §200(8) bb., p. 1014. [My emphasis.]

have almost no control. The handwriting of doctors is notoriously illegible. Because of this illegibility, and the practice of doctors to use abbreviations in their written prescriptions, a nurse may confuse digitoxin with digoxin (or digitalis). She confuses the abbreviation for gram (gm.), or the abbreviation for teaspoonful (tsp.) for tablespoon (tbs.). Or, she mistakes the direction for an intravenous injection (IV) with that for an intramuscular injection (IM).

Similar errors, rooted in human frailty, might occur when a nurse calls a doctor by 'phone regarding the condition of a patient and medication is on an oral or telephone order. For example, a doctor may say castor oil, but a nurse hears camphor oil. He says 15 milligrams of a drug, but she understands it as 50 milligrams. He says argyrol; she interprets it as agoral. He says pavatrine; she hears it as papaverine. He says signemycin, she hears it as sigmagen.

To complicate all this, there is the unremitting pressure of a shortage of nurses and the multiplicity of new drugs, and of patients. The nurse has increasingly little time to handle her duties, yet, she must know much more about many more drugs than ever before. In the ten-year period from 1951 through 1960, it is said that an average of 357 new drugs and 106 new dosage forms (ampules, for example, instead of tablets) were produced every year. It has been estimated that three out of every four prescriptions written today are for drugs and drug forms that did not exist 25 years ago. It is difficult enough for trained pharmacists to keep pace with all the new drugs and their uses. It is still more difficult for nurses, who have many other duties besides their pharmacy work which they are required to do as professionals, in the employ of hospitals.

Or consider the circumstance where the patient himself is largely responsible for his own injury or fatality. There is the patient who wilfully refuses to follow the instructions of the nurses. He may secretly take food, alcohol, narcotics, or other drugs which are prohibited to him. Or he may profess to take medication which he does not take. He may get out of bed and over-exert himself, or open a window and over-expose himself, from which complications, such as pneumonia and death, may occur. In each of these events the cause of injury or death would probably remain unknown to the management of the hospital and might remain unknown to its agents and servants.

Too, there is the known fact that the human body is such that it responds differently to the same medication and treatment. Thus, untoward results frequently occur, which are beyond explanation.

The above are only a few circumstances and reasons which, in my opinion, demonstrate that even though a charitable hospital may be held liable for the negligence of persons in managerial or supervisory capacities for their failure to provide proper instrumentalities used in the operation of a hospital, the hospital cannot be held liable for the negligence of all its agents and servants, over many of whom it has only limited control; and there is much less reason, grounded upon both public policy and the rules of evidence, why such hospitals should be charged with the burden of proving their *lack* of negligence, under the doctrine of res ipsa loquitur, merely because a patient experiences an untoward result from his care and treatment.

*Four*: Finally, in my opinion, if the rule of liability as applied to charitable hospitals is to be so drastically changed, the change in public policy should be effected

by an act of the legislature, and not by a decision of this court.

NOTE.—Reported in 196 N. E. 2d 274.