Jose Victor HERNANDEZ and wife,
Maria Elena Hernandez,
Plaintiffs-Appellants,

v.

Richard A. SMITH, D. O., and the Campbell and Fifth Street Hospital, Incorporated, Defendants-Appellees.

No. 75–3062.

United States Court of Appeals,
Fifth Circuit.

May 16, 1977.

Joseph (SIB) Abraham, Jr., Charles Louis Roberts, El Paso, Tex., for plaintiffs-appellants.

J. Malcolm Harris, El Paso, Tex., for defendants-appellees.

Before GODBOLD, TJOFLAT and HILL, Circuit Judges.

GODBOLD, Circuit Judge:

In a jury trial the appellants, husband and wife, recovered a verdict against an obstetrical clinic for actual and punitive damages, based on negligence relating to care of the wife. The trial court granted judgment n. o. v. for the clinic. We reverse and remand with instructions to reinstate the verdict.

In June 1971, appellant Maria Elena Hernandez, an expectant mother, contracted with the Campbell and Fifth Street Hospital, Inc., located in El Paso, Texas, for obstetrical care during her pregnancy and delivery, for which she agreed to pay the modest sum of $190.00. The hospital was actually a small, 14-bed obstetrical clinic which had no surgical facilities for delivering babies by caesarean section. Mrs. Hernandez was placed under the care of defendant Dr. Richard Smith, an osteopath, who was the clinic's only regular attendant physician.

After a number of visits over a period of several months, Mrs. Hernandez arrived at the clinic in the early morning hours of November 9, 1971, in labor. It was determined after a time that a caesarean section would be necessary. Mrs. Hernandez, who speaks and understands little or no English, was prepared for delivery by a medical assistant, and Dr. Smith, who was summoned to the clinic to attend her, arrived shortly. The presentation of the child was not normal, and Dr. Smith observed that a prolapse of the child's arm had occurred. He thereupon spent a period of time, of disputed duration, attempting to perform a "version and extraction," that is, attempting manually to turn the child in such a way as to

permit a normal delivery. Concluding that a version could not be achieved and that a caesarean section would be necessary, Dr. Smith telephoned Dr. Juan Rodriguez, a medical doctor and president of defendant clinic, who occasionally assisted in medical duties. Dr. Rodriguez directed Dr. Smith to have Mrs. Hernandez transferred to a local general hospital. An ambulance was summoned and Mrs. Hernandez was taken away. No employee or officer of defendant clinic accompanied her. As instructed by Dr. Smith on the orders of Dr. Rodriguez, the ambulance driver carried Mrs. Hernandez to Thomason General Hospital, a local charity institution where Dr. Rodriguez had staff privileges. At no time did Dr. Rodriguez, Dr. Smith, or any employee of defendant corporation ever take any medical or administrative steps to assist Mrs. Hernandez after she was placed in the ambulance.

At Thomason General, Mrs. Hernandez was taken to the emergency room, where doctors determined that her unborn child was dead and that no medical emergency existed. Therefore she was refused admittance to Thomason as an alien not requiring emergency treatment, and was sent by Thomason staff to Mexico, where she was delivered by caesarean section of the dead child in a Mexican hospital several hours later.

Mrs. Hernandez and her husband sued Dr. Smith and the clinic, alleging damages for pain and suffering and for mental distress arising from the negligence of defendants.[1] A jury found that Dr. Smith was not negligent but found negligence on the part of the clinic and awarded $10,000 actual damages and $10,000 exemplary damages. The trial judge granted judgment n. o. v. for the clinic on the ground that Dr. Smith was absolved of negligence and there was no evidence of wrongdoing committed by others and chargeable to the clinic.

■ The trial judge's theory was that only Dr. Smith's negligence or that of some other servant of the clinic on the scene when Mrs. Hernandez was there in labor could subject it to liability. Texas law however provides that a hospital may be liable independently of its agents' negligence for failure to provide adequate facilities:

> It seems it must follow as a matter of course a hospital is liable to a patient for the failure to provide proper and safe instrumentalities for the treatment of ailments it undertakes to treat, because such is in the conduct of the institution. *The agents and servants do not supply the instrumentalities. It is the institution that does that.* Of course, it may not be said it must undertake to treat every ailment that comes but when it undertakes the treatment then it is incumbent upon it to supply suitable and safe appliances and instrumentalities. The ordinary patient submits himself without knowledge and without question of what may be proper and necessary.

*Medical & Surgical Memorial Hospital v. Cauthorn,* 229 S.W.2d 932, 934 (Tex.Civ. App.1949), *writ ref'd n. r. e.* (emphasis added).[2] From the beginning of this suit appellants' contentions included the charge that the clinic was negligent in failing to provide caesarean facilities as part of its obstetrical care. This point was argued to the jury and included in the charge. It was to this contention that appellants' expert medical witness addressed himself when he testified that "the availability of Caesarean Section . . . is essential to modern obstetrical care."

■■ As the language of the foregoing excerpt from the *Cauthorn* case suggests, a medical facility may narrow the scope of its medical undertaking *if it informs the patient of the limitation.* Thus the trial

---

1. Appellants also sued for the death of the unborn child, but the trial judge ruled that there was no evidence that defendants caused the death. Although appellants appealed from this ruling, they withdrew the assignment of error at oral argument, conceding that the evidence did not make a jury issue on this point.

2. Although *Cauthorn* involved improvised equipment, the principle is equally applicable to a total lack of equipment. See "Annotation: Hospital Liability—Lack of Equipment," 50 ALR3d 1141.

judge's charge to the jury that defendant clinic was "not under any legal duty to maintain facilities for conduct of major surgical operations" (including caesarean sections) was correct so far as it went, but in light of the testimony of appellants' expert it must rest on the premise that the duty to warn of medical limitations has been discharged. That all parties clearly understood this is shown by the extensive testimony devoted to the question of whether or not appellants were told of the lack of caesarean facilities at the clinic. Mrs. Felix, defendant's office manager, testified that although she could not say positively that she had informed Mrs. Hernandez in particular of the lack of caesarean facilities, it was her unvarying policy to so inform all patients. Mrs. Hernandez, on the other hand, testified positively that she received no such information and did not know that the clinic's facilities were so limited. Mr. Hernandez corroborated his wife's testimony, stating that "they never told us that they didn't have the facilities there." Mrs. Hernandez had never borne a child in a medical facility before.[3] On this evidence it was open to the jury to conclude that Mrs. Hernandez was not properly advised and that consequently defendant clinic breached its duty "to provide proper and safe instrumentalities for the treatment of ailments it undertakes to treat." *Cauthorn, supra* at 934.

Appellees argue that no substantial causal connection was shown to exist between the lack of facilities and Mrs. Hernandez' suffering. They recognize that appellants' expert testified that the delay in obtaining access to caesarean facilities was a cause of Mrs. Hernandez' suffering, but argue that the expert's opinion was based on a misapprehension of the length of the delay. The dispute over the length of time Mrs. Hernandez was kept at the clinic after it had been determined that a caesarean

was necessary was fully explored before the jury. The expert testimony did not purport to establish the length either of the delay or of the period of suffering, but merely to establish that the delay, whatever its length, caused Mrs. Hernandez to suffer. It was not the expert's function to determine the degree or quantum of suffering, much less its monetary value. See *Hernandez v. Baucum*, 344 S.W.2d 498 (Tex.Civ. App.1961), *writ ref'd n. r. e.; Harbuck v. Ramos*, 371 S.W.2d 912 (Tex.Civ.App.1963); *Ruffo v. Wright*, 425 S.W.2d 663 (Tex.Civ. App.1968). It is unnecessary to consider whether the further delay experienced by Mrs. Hernandez when she was refused admittance to the general hospital is chargeable to the clinic.[4] It is incontrovertible that some delay was occasioned by the lack of facilities at the clinic, and the testimony establishes that the ambulance called to take Mrs. Hernandez to Thomason General took some time to arrive at the clinic.

The instant case was submitted to the jury on the theory that only gross negligence would support an award of exemplary damages. The plaintiff did not object to the trial judge's failure to charge on intentional wrong as a basis for exemplary damages. Thus liability for exemplary damages can be based on Mrs. Felix's alleged failure to inform Mrs. Hernandez of the lack of caesarean facilities only if such failure could have been found by the jury to amount to gross negligence. Under Texas law, there cannot be that "conscious indifference" to the welfare of others constituting gross negligence for purposes of exemplary damages if it is shown that defendant exercised even "slight" care. *Ballenger v. Mobil Oil Corporation*, 488 F.2d 707 (CA5 1974), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974).

The only testimony concerning whether Mrs. Hernandez was informed of

---

3. Appellants also offered as witnesses other patients whose testimony was excluded as irrelevant to the particular transaction at issue but who were prepared to testify that they also had received no warning of the lack of caesarean facilities.

4. Although the clinic's failure to tell her that the care it undertook to provide did not cover the possibility of a caesarean effectively foreclosed her opportunity to make alternate arrangements for this contingency.

the clinic's lack of caesarean facilities was that of Mr. and Mrs. Hernandez on the one hand and of Mrs. Felix on the other, as summarized above. Neither Dr. Rodriguez nor any other officer or employee of defendant clinic was asked about this alleged policy.[5] Plaintiff attempted to refute Mrs. Felix's claim that the clinic had a policy of informing patients of the limitation, by offering as witnesses other patients who were prepared to testify that they had received no such information. Appellees successfully objected to this testimony as irrelevant. It was relevant as refutation of Mrs. Felix's testimony concerning the existence of an alleged unvarying policy. But, in any event, the jury was entitled to accept the specific testimony of appellants and reject Mrs. Felix's description of her "policy." The evidence was not such as to compel a finding that the clinic took even slight care to disclose to Mrs. Hernandez that it lacked provision for what appellants' expert testified is an essential element of modern obstetrical care. The jury could conclude that the clinic, whose principals were shown to be well aware that a certain percentage of all deliveries require caesarean section, acted with conscious indifference to Mrs. Hernandez' welfare.[6]

■ Under Texas law, the clinic cannot be liable for exemplary damages imposed because of Mrs. Felix's conduct unless Mrs. Felix was within one of the classes of corporate "vice-principals" recognized by the leading case of *Fort Worth Elevators Co. v. Russell,* 123 Tex. 128, 70 S.W.2d 397 at 406 (1934):

(a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business

. . . .

The evidence was sufficient to support a finding that Mrs. Felix had been entrusted with the management of a department of the clinic's business. She testified as follows concerning her responsibilities as office manager:

Q. As office manager, could you please tell the Jury what your responsibilities were?

A. Well, I would have to do all of the medical records, birth certificates, mainly run all of the office procedures that we have there.

She went on to say that she was the person who informed new patients of the limitations of care provided. On cross-examination she agreed to the characterization of herself as the hospital administrator:

Q. You are the hospital administrator?

A. Right.

Q. Mrs. Olivo [a staff nurse] is in your employment, is that right?

A. Right.[7]

5. Dr. Smith was asked if he *personally* had informed Mrs. Hernandez of the lack of facilities for caesarean section, but he testified that he did not remember.

6. There is Texas authority for the idea that only "positive and affirmative" negligence, as opposed to merely "passive," can amount to gross negligence. *Nichols v. Texas Electric Service,* 206 S.W.2d 860 (Tex.Civ.App.1947), *writ ref'd n. r. e.* In the context of exemplary damages, however, this seems to mean only that the negligence shown must be such as to evidence a mental attitude of conscious indifference. The standard definition of gross negligence for purposes of exemplary damages, repeatedly approved by Texas courts, is stated as follows:

"It is to be observed that the definition quoted uses the words 'conscious indiffer- ence,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence often, and perhaps usually, is. As said in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted, in, and confined to, cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R.C.L., p. 590. Mere indifference *is* not enough. The indifference must be conscious."

*J. S. Abercrombie Co. v. Scott,* 267 S.W.2d 206, 210 (Tex.Civ.App.1954), *writ ref'd n. r. e.*

7. The trial judge did not consider the possible liability of the hospital for abandonment of the patient. Under the law of Texas a physician

The judgment of the district court is RE-VERSED, and the case is REMANDED with instructions to reinstate the verdict of the jury.

may be liable for abandonment of a patient where there is "unilateral severance of the professional relationship between himself and the patient without reasonable ˙notice at a time when there is still the necessity of continuing medical attention." *Lee v. Dewbree*, 362 S.W.2d 900 (Tex.Civ.App.1962). Although we find no Texas authority extending this duty to a hospital which has contracted directly with a patient for medical services to be performed by its employee doctors, other states impose cognate obligations on hospitals not to abandon their patients. See *Le Juene Road Hospital v. Watson*, 171 So.2d 202 (Fla.App.1965), and dictum in *Birmingham Baptist Hospital v. Crews*, 229 Ala. 398, 157 So. 224 (1934). We need ˙not address the abandonment theory in this case, since we have concluded that the liability of the clinic, both as to actual and exemplary damages, is adequately grounded on the inadequacy of its facilities and its failure to advise Mrs. Hernandez of the limitations of the care it offered.