**J. S. ABERCROMBIE CO.**

v.

**SCOTT et al.**

No. 12626.

*Court of Civil Appeals of Texas.*

Galveston.

March 18, 1954.

Rehearing Denied April 22, 1954.

Fulbright, Crooker, Freeman & Bates and M. S. McCorquodale, Charles M. Haden, and William H. Vaughan, Jr., Houston, for appellant.

Frank Rosson, San Antonio, Eugene J. Wilson, Houston (Kemper & Wilson, Houston, of counsel), for appellee.

HAMBLEN, Chief Justice.

This suit was instituted in the District Court of Brazoria County by Mrs. Arminta Lois Scott, individually and as guardian of her three minor children, against J. S. Abercrombie Company to recover damages for the death of Floyd Scott, husband and father respectively of plaintiffs, which was alleged to have been caused by gross negligence on the part of the defendant company, employer of the deceased. Trial was to a jury, which, in response to special issues submitted by the court, found the defendant guilty of gross negligence on a number of counts and awarded plaintiffs actual damages in the sum of $195,000.00 and exemplary damages in the sum of $135,000.00. Upon such verdict judgment was rendered in favor of the plaintiffs in the amount of $135,000.00 exemplary damages, the defendant company being a subscriber to the Workmen's Compensation Act insofar as actual damages were recoverable. From such judgment J. S. Abercrombie Company appeals.

Appellant presents 36 points of error. Points 1 to 5, inclusive, are based upon the proposition that the judgment should be reversed and rendered in appellant's favor because of the insufficiency of the evidence to justify the submission of issues on gross negligence or to support the findings of the jury thereon. The remaining points of error asserted by appellant are directed to errors which, if sustained, would require that the judgment be set aside and the cause remanded for retrial. Points 6 to 8, inclu-

sive, assert that the answers of the jury to the issues on exemplary damages were against the overwhelming weight and preponderance of the evidence, grossly excessive, and were arrived at through misconduct on the part of the jury. By point 9 appellant contends that the jury's finding that the deceased did not assume the risk of the injury which caused his death is against the overwhelming weight and preponderance of the evidence. Point 10 is directed to the refusal of the court to submit the requested issue of unavoidable accident. Points 11 to 13, inclusive, are directed to the form of certain submitted issues on the ground that they constitute a general charge. Points 14 to 25 are directed to the definition of gross negligence used in the court's charge. Points 26 to 34 are directed to the definition of proximate cause used in the court's charge, and points 35 and 36 complain of the form of certain submitted issues on the ground that they constitute a comment on the weight of the evidence.

After carefully considering the record in this case, especially the testimony therein reflected which had any bearing upon the issue of gross negligence, this Court feels compelled to hold that the trial court erred in overruling appellant's motion for an instructed verdict and its motion for judgment non obstante veredicto. This conclusion, if correct, requires that appellant's points 1 to 5, inclusive, be sustained and that the judgment of the trial court be reversed and judgment here rendered in favor of appellant. This conclusion also renders unnecessary any consideration of appellant's remaining points of error and appellees' counter-points in reply thereto.

The accident appears to have occurred in substantially the following manner: The deceased, Floyd Scott, was a member of a five-man maintenance crew of mechanics employed by appellant to repair and maintain machinery and equipment in a pressure maintenance plant operated by appellant as a part of its gasoline plant in the Old Ocean Field in Brazoria County. The over-all purpose of the gasoline plant was the extraction of liquid gasoline from natural gases produced in the Old Ocean Field. After extraction of such liquids from the produced gas, the remaining dry gas was conveyed by pipes to the pressure maintenance plant where it was compressed to a pressure of 3750 pounds per square inch. Upon reaching such pressure, the dry gas is conveyed by pipes into the same subterranean strata from which it was originally extracted, the object being to maintain the pressure in the gas producing strata and thus facilitate the extraction of the gasoline bearing natural gases.

The pressure maintenance plant is housed in a rectangular metal building, within which are installed 22 gas compressors, 11 on each side of the building. Compressed gas leaves the plant in a 5 inch discharge line which returns the gas by connecting lines to the producing underground strata. A part of the equipment of the pressure maintenance plant consisted of a 4 inch vent line buried several feet underground which after encircling the plant continued to a point some distance therefrom where it was turned upward and terminated above ground as an open-ended line. The purpose of this vent line was to relieve the gas pressure within the various compressors either when desired for the purpose of repair or when the pressure exceeded that considered safe. To effectuate this purpose each compressor was connected to the vent line by two lines leading through the wall of the building adjacent to such compressor and thence underground to the vent line. One such line was called a "bleeder line." It consisted of a 1 inch line in which was contained a manually operated valve, by the operation of which pressure within any compressor could be intentionally relieved into the vent line. The other line was called a "shear valve line." It consisted of a 2 inch line which led from the compressor through the wall of the building into a "U" shaped pipe which in turn connected to a perpendicular pipe leading to the underground vent line. In the "U" shaped portion of this line was installed a shear valve designed to open automatically when pressure exceeded that considered safe.

Floyd Scott died as the result of burns caused by a fire which occurred on November 28, 1950. For several days prior thereto he, together with other members of the maintenance crew, had been engaged in the execution of a plan whereby the shear valve line would be eliminated as a safety device and in its place would be substituted an automatic pressure relief valve installed in a perpendicular pipe exhausting into the air above the roof-line of the plant building. The accomplishment of this plan entailed the removal of the "U" shaped portion of the shear valve line by disconnecting it at a point outside the building wall from the pipe leading from the compressor and disconnecting it above the ground from the pipe leading to the underground vent line. The plan contemplated that the pipe leading to the underground vent line would be capped or plugged and the line leading from the compressor would be connected to the perpendicular pipe exhausting above the roof of the building. This operation was required for each of the 22 compressor units. The vertical vent line was to be attached to the wall of the building by metal brackets. At the time of the fire Scott and another workman, James Clayton, were on a ladder 10 or 12 feet above ground using an electric drill to bore holes through the building wall into which the metal brackets were to be bolted. The "U" shaped portion of the shear valve line had previously been removed but the line from which it had been disconnected leading to the underground vent line had not been capped or plugged but was left open-ended. Gas from some source came through such open-ended line, ignited and caused serious burns to both men. Clayton recovered but Scott died a few days later.

The work described had been in progress for several days when the fire occurred and several of the shear valve lines had been replaced with the vertical pressure relief valves. Scott with the other members of his crew reported for work about 6 a. m. on the day of the fire. The crew consisted of Scott, Clayton, Ray Ward, who was designated as leaderman, and two other men. Scott and Clayton removed the "U"

shaped portion of the line containing a shear valve. They checked a pipe leading to the underground vent line and detected no appreciable amount of gas, stuffed rags therein and wired them in the pipe. They then proceeded with the installation of the vertical pipe leading above the roof of the building by boring holes in the building wall to which the vertical pipe was to be bolted for support. At about 7 a. m., while this operation was in progress, Reeves, who was identified as foreman of the pressure maintenance plant, arrived. He testified that upon inspecting the rags which had been stuffed in the line leading to the underground vent line, he instructed Scott and Clayton that they might continue that particular installation but upon its completion and before proceeding with additional installations to wait until 8 a. m., at which time they were to procure blind flanges from the welding shop with which to cap the pipe in lieu of stuffing rags therein. Ray Ward, leaderman, testified to giving similar instructions to Scott and Clayton. The testimony of Reeves and Ward was corroborated by Clayton. The other two members of the crew denied hearing Reeves or Ward give such instructions. The evidence is undisputed, however, that after his appearance at 7 a. m. Reeves departed and was not thereafter present until after the fire.

After completing the first installation Scott and Clayton removed the next "U" shaped pipe. No gas was detected in the line leading to the vent line. No blind flanges were immediately available. Clayton testified that he and Scott thereupon decided mutually to proceed with drilling without waiting for flanges. With this second installation successfully completed they proceeded to the next, which was in like manner undertaken without blind flanges and apparently without taking the initial precaution of stuffing rags in the open-ended vent line. Their work proceeded in such manner throughout the morning and until 2 p. m., when the fire occurred.

In response to special issues submitted, the jury convicted the defendant of gross negligence on 7 counts, as follows: (1)

failure to provide Scott with a reasonably safe place to work, (2) failure to have in effect safety rules for the use of electric drills in a hazardous area, (3) failure to provide for holding safety meetings within a reasonable time before the fire, (4) providing Scott with unsafe drill, (5) failure to furnish and have available blind flanges to seal off open-ended vent pipes, (6) failing to order blind flanges placed on open-ended vent pipes before drilling, and (7) failure to inspect the drilling tool used by Scott.

It is our opinion that under the facts of this case, none of the jury findings as a matter of law constitute gross negligence as that term has been defined and limited by decisions of the Texas Supreme Court.

■■■ In Texas Pac. Coal & Oil Co. v. Robertson, 125 Tex. 4, 79 S.W.2d 830, 831, 98 A.L.R. 262, the Supreme Court uses the following language: "The definition of gross negligence which has probably been quoted oftener than any other by the courts of this state is that given by Judge Stayton in Missouri Pac. R. Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411, and is as follows: 'Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it.'

\* \* \* \* \* \*

"It is to be observed that the definition quoted uses the words 'conscious indifference,' thus stressing the mental attitude of the person charged to have been grossly negligent. Gross negligence is positive or affirmative, rather than merely passive or negative as ordinary negligence often, and perhaps usually, is. As said in the discussion in Ruling Case Law of the right to recover exemplary damages for gross negligence: 'The rule is that recovery is permitted, in, and confined to, cases where the negligence is wilful, or where it is so gross as to indicate wantonness or malice.' 8 R. C.L., p. 590. Mere indifference is not enough. The indifference must be conscious. The indifference is to the rights or welfare of the person or persons who may be affected by the act or omission. Thus the doctrine of foreseeableness becomes important."

In the case of Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, which is perhaps the latest expression of the Texas Supreme Court on the subject, Judge Sharp reviewed at length the applicable Texas authorities relating to gross negligence and followed the definition given by Judge Stayton in Missouri Pac. R. Co. v. Shuford, which is quoted above.

■■■ The acts or omissions on the part of the appellant which the jury found constituted gross negligence should therefore be examined in the light of the facts surrounding the incident involved and the rules of law which have been enunciated by our Supreme Court. The evidence in this case is undisputed that the pressure maintenance plant where the fire occurred had been in operation for ten years or more. So far as this record shows, the plant as a place to work was as safe on the day of the fire as it had been throughout the period of its operation. In any event, any additional hazard incident to the work being done by the deceased was created by his own act, as will be discussed later. General instructions had been given to the operators that no compressor was to be "bled down" without first notifying the maintenance crew. There is no evidence that these instructions had not been followed. Block valves had been closed to prevent the automatic operation of the pressure relief valves and shear valves. All that the evidence shows is that appellant's plant was designed to handle a highly explosive or combustible gas under high pressure, but there was no showing that it was not properly designed and operated. Appellant makes the contention, and cites authorities in support thereof that Special Issue No. 1 which inquired of the jury whether the appellant failed to provide Scott with a reasonably safe place in which to work calls for a conclusion of law and enables the jury to return a general verdict.

We are not prepared to hold that an issue so framed would be improper in all fact situations. We are prepared to and do hold that from our review of the evidence, no showing was made of any fact relevant to the plant as a place to work which would raise the belief of conscious indifference or would indicate wantonness or malice, which showing would be necessary for support to a finding of gross negligence. As to the finding of gross negligence in failing to have in effect safety rules for the use of an electric drill, the same reasoning applies. The evidence shows that electric drills and other electrically driven tools had been in use within the pressure maintenance plant throughout its period of operation without accidental fire. The fact that there might be a safer drill which could be used does not make the use of electric drills gross negligence under such circumstances. The absence of care required in gross negligence is not a matter of degree. There must be an entire want of care. The failure to hold safety meetings within a reasonable time before the fire, by its very phraseology removes that omission from the field of gross negligence. The evidence is undisputed that safety meetings had been held by appellant, thus showing the exercise of some care. The finding of such failure within a reasonable time before the fire introduces the element of degree of care. Furthermore, in view of the experience of Scott in the work in which he was engaged and the manner in which he voluntarily proceeded in such work hereinabove described indicates that an entire failure to have safety meetings would not constitute a proximate cause of his injuries. The litigants are in disagreement as to the probative effect of the evidence introduced as to whether Scott, at the time of the fire was using a one-half inch electric drill on which the switch was broken, or was using a one-quarter inch electric drill described as being in perfect condition. The jury found that he was using the one-half inch drill. This finding appears, upon our review, to be contrary to the overwhelming weight and preponderance of the evidence, as does the finding that the use of such drill proxi-

mately caused the fire. However, the evidence is undisputed that electric drills, electric floor polishers and open flame welding torches had been safely used in the plant in the past. There is no evidence that the drill which the jury found Scott was using was any more hazardous than implements which had been continuously in use without causing fires. This, together with the rules and instructions designed to prevent the escape of gas while such implements are in use, negatives the necessary element of conscious indifference, and fails to indicate wantonness or malice. Therefore, even if there be support in the record for the mentioned findings of the jury, they could at most amount to ordinary negligence resulting from a failure to use reasonable care, and not gross negligence which requires an entire want of care.

The litigants are again in dispute as to whether the evidence supports the jury findings to the effect that appellant failed to furnish and have available blind flanges and failed to order blind flanges placed on open-ended vent pipes. As to the first-mentioned finding, we have carefully reviewed the evidence and find it capable of no construction except that flanges were not available only because Scott and Clayton upon their own initiative decided to proceed with their work without waiting for flanges to be furnished. The evidence is conclusive that Scott and Clayton could, by waiting, have insured their safety by capping the open-ended pipe with flanges. A member of their crew was approaching with flanges for the pipe at the instant the fire occurred. The evidence is likewise conclusive that Scott and Clayton were aware of the danger involved in proceeding without flanges. Their action in stuffing rags in the first pipes indicates this. The finding that appellant failed to order flanges placed upon open-ended vent pipes appears upon review to be against the overwhelming preponderance of the evidence. However, even if it could be conceded that there is evidence in the record to support such jury finding, that finding could not, as we construe the law, amount to gross negligence.

In Tullos v. Texas Pipe Line Co., Tex. Civ.App., 145 S.W.2d 267, an employee was fatally injured by burns received by cutting an oil pipe line with an acetylene 'torch. The contention was made that the failure of the employer to order the cutting by hand tools rather than the torch constituted gross negligence. This Court held that such failure did not constitute gross negligence because acetylene torches had been used for that same purpose without accidental fire, which negatived the necessary element of conscious indifference.

Appellant, in its brief, forcefully argues that Scott's action in proceeding with his work without installing the flanges on the open vent pipe was the sole proximate cause of his injuries. Whether this contention be correct or not, it is readily apparent that the fire and resulting injuries would not have occurred had flanges been employed. The only vice principal of appellant who had any contact with the work so far as the use of flanges was concerned was Reeves. No contention was made that Reeves ordered Scott to proceed without flanges. The most that is contended is that he failed to order their use. In view of Scott's experience in the work being performed and his awareness of the danger involved, such failure does not indicate an entire want of care or a conscious indifference to the rights of Scott. The mere failure to order the use of a safety device is negative. Gross negligence must be affirmative.

We have cited Texas Pac. Coal & Oil Co. v. Robertson, Tullos v. Texas Pipe Line Co. and Bennett v. Howard, as being authorities for the conclusions that we have reached. Other authorities which likewise support our conclusions are Missouri Pac. R. Co. v. Shuford, 10 S.W. 408, Valencia v. Western Compress & Storage Co., Tex. Civ.App., 238 S.W.2d 591 (Eastland C.C.A.), Langston v. Tex-O-Kan Flour Mills Co., Tex.Civ.App., 211 S.W.2d 1020 (San Antonio C.C.A.), and McAlester v. Sinclair Refining Co., 5 Cir., 146 F.2d 36.

Within the scope of our law, appellees have been compensated for their actual damages suffered as a result of the tragic incident upon which this suit is based. The theory of exemplary damages involves a blending of the interests of society in general with those of the aggrieved individual in particular. The sum is said to be awarded as a punishment of the wrongdoer and not as compensation to the injured persons; it is intended as a warning and an example to prevent the defendant and others from the commission of like offenses and wrongs. Its punitive nature carries with it the implication of intentional or wilful injury. When the evidence in the present case is examined as a whole, any negligent act or omission shown to have been committed by appellant appears to this court to be passive or negative, rather than positive or affirmative. Each fails to meet the requirement that there be an entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person to be affected by it. There is no indication of wilfulness, wantonness or malice. As we construe the applicable authorities, the elements mentioned are necessary to support the finding of gross negligence.

In their brief appellees have directed certain of their points to the asserted failure of appellant to adequately preserve the errors which it complains of insofar as the record is concerned. We have concluded that this appeal is determinable solely upon the law proposition that the record contains no evidence supporting the finding of gross negligence. This proposition was raised by appellant in points 1 to 5, inclusive. The errors complained of appear to have been adequately raised within the provisions of Rule 324, T.R.C.P., in appellant's motion for instructed verdict and its motion for judgment non obstante veredicto.

For the reasons discussed, the judgment of the trial court is reversed and rendered.

Reversed and rendered.