Lawrence KNABE, Sr. and Lawrence Knabe, Jr., Plaintiffs-Appellants Cross-Appellees,

v.

NATIONAL SUPPLY DIVISION OF ARMCO STEEL CORPORATION, Defendant-Appellee Cross-Appellant.

No. 77–1251.

United States Court of Appeals, Fifth Circuit.

April 5, 1979.

---

Cletus C. Schenk, James E. Cook, Wichita Falls, Tex., for plaintiffs-appellants cross-appellees.

Royal H. Brin, Jr., Dallas, Tex., for defendant-appellee cross-appellant.

Before INGRAHAM, GEE and FAY, Circuit Judges.

GEE, Circuit Judge:

Appellants Lawrence Knabe, Sr. and Lawrence Knabe, Jr. were awarded compensatory and exemplary damages by a jury for injury to their dairy business as a result of water pollution caused by appellee National Supply. The district court set aside the jury award of $50,000 exemplary damages and entered judgment against National Supply for compensatory damages in the amount of $76,800. The Knabes appeal, asking for reinstatement of the exemplary damages. National Supply cross-appeals, contending that the actual damages are partially duplicitous and speculative.

National Supply, a division of Armco Steel Corporation, an Ohio corporation, has been engaged in the business of manufacturing heavy machinery in Cooke County, Texas, since 1955. In connection with its manufacturing operations, National Supply uses a mixture of emulsified cutting oil and water for cooling purposes. Because Na-

tional Supply was not permitted to discharge this mixture into the city sewer, it pumped the effluent into a pond located on its property. Periodically, because of seepage and overflow, the effluent would escape and flow into a creek that ran through the Knabes' pasture. This drainage problem was aggravated in August 1973 when a hole was cut in the pond dam for the purpose of lowering the water level to facilitate the repair of a gas line located beneath the pond. This hole in the dam permitted the effluent to flow unimpeded into the creek and across the Knabes' pasture.

The Knabes are Texas residents who have operated a dairy business on land adjacent to the National Supply plant since January 1974. Shortly after starting their operation with a proven herd of dairy cattle, they began to experience a decrease in milk production. Although they took the customary measures for improving milk production, their production continued to decrease both in quality and quantity. Because of the decline in the quality of the milk, the Associated Milk Producers, Inc. refused to pay Grade A prices for milk purchased from the Knabes after July 31, 1974, and on October 31, 1974, the Associated Milk Producers discontinued purchases from the Knabes altogether. The Knabes thereafter sold their herd for slaughter because the cattle were no longer fit for dairy use.

After continuous investigation and testing, the Knabes finally determined in August 1974 that the decrease in production quantity and quality was attributable to the cattle's ingestion of creek water contaminated by the effluent discharged by National Supply. The Knabes immediately contacted National Supply about the problem, and investigative agents from the Environmental Protection Agency made two plant visits to National Supply concerning the discharge. After the first plant visit, National Supply assured the EPA that the discharge would be eliminated. In an effort to stop the discharge, National Supply

spent $18,000 to enlarge the pond, construct a dike partially around the pond, and re-channel the creek. When an EPA agent returned on October 15, however, there was still a discharge from the pond into the creek. On October 30, 1974, National Supply received a letter from the Enforcement Division of the Environmental Protection Agency warning National Supply to take "prompt remedial action" to eliminate totally the illegal discharge into the waters of the United States. On November 8, 1974, National Supply informed the EPA that the discharge had been completely eliminated and that it planned to complete the dike and bypass system within two weeks. Despite this letter of assurance to the Environmental Protection Agency in 1974, a third plant visit by an EPA inspector in August of 1976 indicated that National Supply still had an illegal discharge. The EPA inspector testified that the effluent was seeping through the earthen dike and that 90 percent of the discharge could be eliminated by properly sealing the dike. Once again National Supply informed the EPA that it was planning several projects to halt the discharge at a total financial commitment of $100,000. There was testimony at trial, however, that the discharge was continuing even in November 1976, and there was no evidence indicating that National Supply had completed any of the proposed projects to eliminate the discharge. As of the date of trial, more than two years after the Knabes first alerted National Supply to the water pollution problem, they were still unable to graze cattle in the pasture because of the continuing discharge.

The case was tried on theories of intentional tort and negligence. In answers to special interrogatories, the jury found that the discharge of the industrial waste onto the Knabes' premises was both negligent and intentional[1] and awarded both compensatory and exemplary damages.

---

1. Although National Supply attacks these findings as inconsistent, they are easily reconcilable. The jury reasonably could have decided that although the initial discharges were negligent, National Supply's consistent failure to remedy the problem effectively evidenced intentional wrongdoing.

The award of exemplary damages was predicated on a finding by the jury that the conduct of National Supply was "unlawful or malicious or wanton or oppressive or fraudulent or in wanton disregard or conscious indifference for the rights or safety of others or that the act of conduct was done directly with the intent to injure."[2] Upon motion by National Supply, the trial judge set aside the award of exemplary damages on the ground that they were not supported by the evidence. The Knabes contend that the trial judge erred in granting judgment notwithstanding the verdict with respect to the exemplary damages because there was sufficient evidence under the *Boeing*[3] standard to create a jury question.[4]

■ The parties agree that under Texas law exemplary damages can be awarded either on the basis of intentional harm or on the basis of gross negligence. The jury instruction on the issue of exemplary damages clearly covered both bases. National Supply contends that the evidence was insufficient to support an award of exemplary damages on either basis. The Knabes disagree, relying on *Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681 (Tex. 1975), a case that is almost identical to this case, both factually and legally. The *Atlas* case was tried on theories of intentional tort and negligence; the jury found that the discharge was both negligent and willful and awarded exemplary damages. The Texas Supreme Court first set aside the award of exemplary damages, noting that Atlas could not be guilty of gross negligence because it had made some efforts to remedy the problem. On rehearing, however, the court reinstated the exemplary damages, deciding that there was evidence to support the jury finding of willfulness. The court concluded that "[a]t some point and under all the circumstances, the failure to make any correction to save downstream property owners from damage finally warrants a decision by the trier of fact that the managerial decision for this operation was made wholly without regard, and with conscious indifference, to the rights of the property owners." 524 S.W.2d at 688. Although National Supply attempts to distinguish *Atlas* by arguing that Atlas' conduct was more egregious than its own, we think that the facts of the two cases are not materially distinguishable. Here the evidence showed that National Supply had been discharging the pollutant since 1955 and that management knew that the pond periodically overflowed and emptied its contents into the creek that ran through the Knabes' pasture. National Supply was not allowed to discharge the pollutant into the city sewer system because of its harmful effects. At least one member of management testified that had he thought about it, he would have realized that the pollutant could endanger the health of livestock. Although the Environmental Protection

---

2. The explication of exemplary damages included the further warning that such damages were proper only if National Supply "acted intentionally or willfully, which indicated a fixed purpose by the defendant to bring about the injury or loss of which the plaintiffs complain." This warning is significant because, under Texas law, exemplary damages cannot be awarded solely on the basis of a showing that the act causing injury was unlawful. *See, e. g., Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681, 687 (Tex.1973).

3. It is well settled that in diversity cases federal courts apply the federal rather than the state standard for determining whether the evidence is sufficient to defeat motions for a directed verdict and for judgment notwithstanding the verdict. *Boeing Co. v. Shipman*, 411 F.2d 365, 368 (5th Cir. 1969).

4. The Knabes also contend that National Supply did not properly preserve its right under Fed.R.Civ.P. 50(b) to move for a partial judgment notwithstanding the verdict on the issue of exemplary damages because it did not move for a partial directed verdict on the issue of exemplary damages. National Supply contends that Rule 50(b) is not applicable to one of several elements of damages and that it properly preserved its right to challenge the award of exemplary damages by timely objecting to the inclusion of a charge on exemplary damages. Because we agree with the Knabes that the partial judgment notwithstanding the verdict was erroneous on evidentiary grounds, we need not reach this procedural issue.

Agency had warned National Supply in October 1974 to eliminate its illegal discharge, the evidence indicated that National Supply still had an illegal discharge more than two years later. There was testimony that 90 percent of the illegal discharge could be eliminated by properly sealing the dike and that other pollution control devices were also available. Although the evidence showed that National Supply, like Atlas, had made some efforts to correct the problem, those efforts were neither thoroughgoing nor effective.

Applying the federal standard for upholding jury verdicts to the Texas standard for evidence sufficient to support an award of exemplary damages in a pollution case, we conclude that there was "evidence of such quality and weight that reasonable and fair-minded [persons] in the exercise of impartial judgment might reach different conclusions"[5] whether "the managerial decision for this operation was made wholly without regard, and with conscious indifference, to the rights of the property owners."[6] Therefore, the exemplary damages must be reinstated.

The jury award of compensatory damages included $53,000 for the difference in market value before and after the date of discovery that the cows were no longer fit for milking purposes, $22,000 for loss of productivity and profits from the date of injury to the date of sale, $1,000 for loss of rental value of the pasture land, and $800 for treatment of injured cattle. National Supply contends that recovery of damages for lost productivity and profits is improper on two grounds. It argues that damages for lost profits are considered too speculative under Texas law when a business is new or unestablished, and it claims that recovery of damages for both decline in market value and lost productivity constitutes double recovery.

■ National Supply's contention that the $22,000 award of damages for lost productivity and profits is too speculative is without merit. National Supply relies on a line of Texas cases that hold that recovery of future profits is improper when a business is new or unestablished because such damages would be too speculative. *See, e. g., Atomic Fuel Extraction Corp. v. Slick's Estate*, 386 S.W.2d 180, 189 (Tex.Civ.App.—San Antonio 1964, writ ref'd n. r. e.). *See also Norris v. Bovina Feeders, Inc.*, 492 F.2d 502 (5th Cir. 1974). That principle is totally inapplicable to this case because the record reveals that the Knabes were not seeking and did not recover future profits. The interrogatory specifically limits damages for lost productivity and profits to the period of time between the date of injury and the date of sale, which eliminates any possibility for the recovery of future profits. The damages awarded for the diminished productivity were adequately supported by the record. There was evidence in the record establishing the average amount of milk the cattle were giving at the start of the operation, the amount of milk the cattle gave throughout the relevant period, and the values of the different amounts of milk. From this evidence the jury could compute the value of milk revenue lost from the date of injury to the date of sale with a reasonable degree of certainty. Precise measurement is not necessary. *Lone Star Gas Co. v. Thomas*, 345 S.W.2d 844, 848 (Tex.Civ.App.—Fort Worth 1961, writ ref'd n. r. e.).

■ National Supply's contention that recovery of damages for both decline in market value and lost productivity constitutes double recovery is likewise without merit. Its theory is that recovery for the diminished fair market value of a dairy cow implicitly includes recovery for diminished productivity because it is the diminished productivity that causes the diminished market value. National Supply's theory is valid insofar as it applies to recovery of damages for loss of future productivity, but recovery for diminished market value does not compensate for loss of past productivity. National Supply relies on a line of

---

5. *Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969).

6. *Atlas Chemical Industries, Inc. v. Anderson*, 524 S.W.2d 681, 688 (Tex.1975).

Texas cases holding that as a general rule the measure of damages for injury to personalty is the difference in market value immediately before and after the injury.[7] *See, e. g., Pasadena State Bank v. Isaac,* 149 Tex. 47, 228 S.W.2d 127 (1950). That is of course true as a general rule, but Texas courts have also held that when "the general rule formula will not afford actual compensation, then a different measure of damages may be used that permits fair and just recovery." *Moran Corp. v. Murray,* 381 S.W.2d 324, 328 (Tex.Civ.App.—Texarkana 1964, no writ). In this case, recovery of diminished market value alone would not be adequate because of the gradual nature of the tort. The tortious conduct of National Supply initially resulted in the diminished productivity of the Knabes' dairy cattle for a period of several months and ultimately necessitated the sale of the dairy cattle at slaughter value. Compensation for the difference between the fair market value of the cattle as dairy cattle and the fair market value of the cattle as beef cattle does not compensate the Knabes for the months of diminished productivity of the cattle before discovery that they were no longer fit for milking purposes. Therefore, recovery of damages for both diminished productivity and diminished market value does not constitute double recovery in this case.

For the foregoing reasons, we reverse the judge's grant of judgment notwithstanding the verdict with respect to exemplary damages and remand the case to the district court with directions to enter judgment in accordance with the verdict in all respects.

REVERSED in part, AFFIRMED in part.

---

**7.** National Supply also cites a Texas case in which the court used decline in fair market value as the measure of damages for injury to dairy cattle caused by water pollution. *Lone Star Gas Co. v. Thomas,* 345 S.W.2d 844 (Tex. Civ.App.—Forth Worth 1961, writ ref'd n. r. e.). That case is not dispositive, however, because there is no indication that the plaintiff there sought damages for diminished productivity of the cattle prior to sale.