623 F.2d 395
 Frank MAXEY and Mary Amanda Maxey, Individually and as Next
Friends of Mary Kathryn Maxey, et al.,
Plaintiffs-Appellants Cross-Appellees,
v.
FREIGHTLINER CORPORATION, Defendant-Appellee Cross-Appellant.
 No. 78-2301.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 8, 1980.
 
 1
 Windle Turley, Sylvia M. Demarest, Dallas, Tex., for plaintiffs-appellants cross-appellees.
 
 
 2
 Strasburger & Price, Royal H. Brin, Elliott, Churchill, Hanson, Dyess & Maxfield, Thomas G. Nash, Jr., Dallas, Tex., for defendant-appellee cross-appellant.
 
 
 3
 Appeals from the United States District Court for the Northern District of Texas.
 
 
 4
 Before VANCE and SAM D. JOHNSON, Circuit Judges and THOMAS*, District Judge.
 
 DANIEL HOLCOMBE THOMAS, District Judge:
 
 5
 Appellants appeal from the trial court's granting of a judgment N.O.V. which set aside a jury assessment of exemplary damages in a products liability case. We affirm.
 
 
 6
 In November of 1977, a trial by jury was commenced before the Honorable Patrick E. Higginbotham, United States District Court, Northern District of Texas. The jury returned a verdict favorable to the appellants on the issues of design defects and gross indifference and awarded $150,000.00 in actual damages and $10,000,000.00 in exemplary damages. The jury also found that plaintiffs' decedent had assumed the risk of injury by use of the appellee's product. By subsequent Order and Opinion entered on April 21, 1978, Maxey v. Freightliner Corp., 450 F.Supp. 955 (N.D.Tex.1978), the trial court set aside the jury's verdict on the issues of gross indifference as well as their determination concerning assumption of the risk. The court let stand the jury's verdict as to actual damages. We affirm the judgment of the District Court.
 
 
 7
 This case involves the design of the fuel system on a truck tractor manufactured by appellee Freightliner Corporation. The tractor portion of this eighteen wheeler carried 160 gallons of fuel in two light-weight aluminum tanks attached to the outside of the truck frame rails. The aluminum side-mounted tanks are connected to each other by an equalizer line attached to a depression in the bottom of each tank, thus permitting fuel to flow between the tanks, and in the event of detachment, to drain from both tanks.
 
 
 8
 On November 21, 1974, the decedents, Billy and Dee Maxey, were en route to Michigan when outside of Comanche, Texas, their tractor/trailer rig tipped over while rounding a curve, and slid to a stop on its right side. The right fuel tank ruptured, spilled its fuel, and ignited.[1] There was substantial disagreement between the parties as to whether the cause of death to the decedents resulted from the actual accident or subsequent fire.
 
 
 9
 The plaintiffs-appellants are Frank Maxey and Mary Maxey, grandparents and next friends of Mary Kathryn Maxey, age 12, and Carroll Kaylene Maxey, age 9, children of the decedents.
 
 
 10
 The Maxey's claims for relief in the trial court included allegations that the design of the fuel system was not reasonably crashworthy, that Freightliner had failed to warn users of the product of this danger, and that Freightliner's conduct regarding the design, testing, and sale of trucks with this fuel system constituted gross indifference meriting the imposition of exemplary damages under Texas law.
 
 
 11
 Appellants noticed this appeal from the trial court's judgment setting aside the jury's verdict on gross indifference. Appellee Freightliner has filed a cross-appeal from the judgment awarding the surviving children actual damages of $150,000.00.
 
 
 12
 I. EVIDENCE OF GROSS INDIFFERENCE SUPPORTING AN AWARD OF EXEMPLARY DAMAGES
 
 
 13
 Appellants urge that in setting aside the jury's verdict of "gross indifference" the trial court failed to note strong evidence in the record showing Freightliner's indifference to consumer safety. We disagree.
 
 
 14
 Judgment N.O.V. should be granted only when the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict, viewing the facts in the light most favorable to the party against whom the motion is made, and giving that party the advantage of every fair and reasonable inference which the evidence justifies. Boeing v. Shipman, 411 F.2d 365, 374-375 (5th Cir. 1974) en banc. Jones & Laughlin Steel Corp. v. Matherne, 348 F.2d 394, 397-398 (5th Cir. 1965). The standard for reviewing such motions is the same in the trial court and on appeal. The Court considers only the question of law regarding the sufficiency of the evidence to raise a jury issue. Boeing v. Shipman, supra; Glazer v. Glazer, 374 F.2d 390, 400 (5th Cir. 1967).
 
 
 15
 Appellants argue that the evidence of Freightliner's gross indifference raised an issue for the jury.
 
 
 16
 The motion for judgment notwithstanding the verdict tests the sufficiency of the evidence in just the same way as does the motion for a directed verdict at the close of all the evidence. Shaw v. Edward Hines Lumber Co., 249 F.2d 434 (7th Cir.). In a doubtful case the court may prefer to deny the motion for a directed verdict, and consider the attack on the sufficiency of the evidence subsequently on motion for judgment N.O.V.
 
 
 17
 If a verdict is directed and the appellate court holds that the evidence was in fact sufficient to go to the jury, an entire new trial must be had. If, on the other hand, the trial court submits the case to the jury, though it thinks the evidence insufficient, final determination of the case is greatly expedited. If the jury agrees with the Court's appraisal of the evidence, and returns a verdict for the party who moved for a directed verdict, the case is at an end. If the jury brings in a different verdict, the trial court can grant judgment notwithstanding the verdict. Then if the appellate court holds that the trial court was in error in its appraisal of the evidence, it can reverse and order judgment on the verdict of the jury, without any need for a new trial.
 
 
 18
 Wright and Miller, Federal Practice and Procedure, Section 2533, Pg. 586.
 
 
 19
 " * * * a motion for a directed verdict or a judgment notwithstanding the verdict should be granted if there is no substantial, i. e., not more than a mere scintilla of evidence to sustain the verdict." U. S. v. Strebler, 313 F.2d 402 (8th Cir. 1963) (See Footnote 1, page 403). "The scintilla evidence rule is not applied in federal courts." Mann v. Bowman Transportation, Inc., 300 F.2d 505 (4th Cir. 1962). See, also Tackett v. Kidder, 616 F.2d 1050 (8th Cir. 1980).
 
 
 20
 The problem, however, lies not with merely stating the rules, but with applying them to a particular set of facts. Were the scintilla rule to be followed in cases such as this, we might easier find error by the trial court in its granting of the motion n. o. v. However, as heretofore stated, the standard is that of substantial evidence to support a verdict. Our careful reading of the transcript reveals no such evidence.
 
 
 21
 Granted, a judgment n. o. v. may at times seem harsh. However, we agree with the trial judge whose presence at the trial afforded him a much better vantage point from which to evaluate the evidence not from a transcript alone, but from seeing and observing the witnesses themselves.
 
 II. EXEMPLARY DAMAGES UNDER TEXAS LAW
 
 22
 In somewhat of a strange dichotomy the jury below found plaintiff's decedent had assumed the risk of using appellee's product, while at the same time awarding the plaintiffs ten million dollars ($10,000,000.00) in exemplary damages.
 
 
 23
 The availability of exemplary damages for wrongful death flows from Article 16, § 26 of the Constitution of the State of Texas:
 
 
 24
 Every person, corporation, or company, that may commit a homicide, through a wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow, heirs of his or her body, or such of them as there may be . . . . Tex.Const. Art. 16, § 26. (emphasis added).
 
 
 25
 Trial and appellate courts have authority to supervise jury awards in such cases. See Fed.R.Civ.P. 50, 59.
 
 
 26
 While we agree that exemplary damages may be appropriate in certain instances, we narrow our focus to the requirements that the defendant's acts be wilful, gross or manifest conscious indifference.
 
 
 27
 Appellants primary argument in this area concerns the trial court's use of language contained in Sheffield Division, Armco Steel Corp. v. Jones, 376 S.W.2d 825 (Tex.1964), and this court's decision following Sheffield in Woolard v. Mobil Pipeline Co., 479 F.2d 557 (5th Cir. 1973). In particular, the trial court focused on language from Sheffield concerning a "complete absence of care", Sheffield, supra, at p. 829 and whether Freightliner acted with an "intent which approximates a fixed purpose to bring about this injury." Id., Maxey v. Freightliner Corp., 450 F.Supp. 955, 964 (N.D.Tex.1978). Appellants contention is that these cases are in effect outdated by more recent Texas authority negating a requirement of "a fixed purpose to injure". Appellants cite McPhearson v. Sullivan, 463 S.W.2d 174 (Tex.1971) and Harbin v. Seale, 461 S.W.2d 591 (Tex.1970) for the proposition that one must look to the surrounding facts and circumstances in determining the propriety of exemplary damages. Harbin, supra, at p. 593 and McPhearson, supra, at p. 176. Were we to accept appellant's argument that such is now the test, we fail to glean from our overview any support for their claim to exemplary compensation.
 
 
 28
 Appellants would have us read Hernandez v. Smith, 552 F.2d 142 (5th Cir. 1977), as providing the strong support for their right to an exemplary award. While such authority may remove any requirement that the defendant act with "purposeful conduct", a closer scrutiny reveals the following at page 143:
 
 
 29
 Under Texas law, there cannot be that "conscious indifference" to the welfare of others constituting gross negligence for purposes of exemplary damages if it is shown that defendant exercised even "slight" care.
 
 
 30
 We are unable to discern from our reading of the record evidence of appellee's failure to use even "slight" care. In light of the aforementioned, we support the actions of the trial judge on this issue.
 
 
 31
 The trial court concluded that Freightliner complied with industry custom, based upon evidence that no commercially produced truck tractor in the United States had fuel tanks located within the frame rails,[2] and that no commercially produced vehicle in the United States used fuel bladders.[3] Appellants contend that this evidence is insufficient to support the trial court's conclusion of compliance with industry-wide custom. Maxey v. Freightliner Corp., 450 F.Supp. 955, 963 (N.D.Tex.1978). We disagree.
 
 III. FREIGHTLINER'S CROSS APPEAL
 
 32
 Freightliner urges reversal of the trial court's determination that decedent, Billy Maxey, did not assume the risk of use from appellee's product. We fail to find favor with such suggestion.
 
 
 33
 As appellants suggest, the contention that Freightliner as a national manufacturer of truck/tractors was unaware of post-crash hazards relating to side-mounted fuel tanks, but that Billy Maxey, a truck driver and mechanic with a high school education should be charged with knowledge and appreciation of the nature and extent of this risk is untenable.
 
 
 34
 Knowledge of the specific defect and appreciation of the dangers created by the defect are required to sustain a finding of assumption of the risk. Bailey v. Boatland, 585 S.W.2d 805 (Tex.Civ.App. Houston 1979). Cases in Texas on volenti or assumption of the risk are clear in requiring subjective knowledge and intelligent appreciation of the specific danger involved.
 
 
 35
 In Rabb v. Coleman, 469 S.W.2d 384 (Tex.1971), the Supreme Court of Texas stated:
 
 
 36
 The intelligent choice to expose oneself to a danger presupposes an awareness of that particular danger. The success of the volenti defense in Texas cases has turned on whether or not it was established that the plaintiff knew he was exposing himself to the danger which in fact caused him harm. Id. at p. 387. (emphasis added).
 
 
 37
 We agree with the trial court that on the facts submitted below and on this appeal, a charge of assumption of the risk against plaintiffs' decedent would be inappropriate.
 
 
 38
 Freightliner argues that the record below fails to support recovery against it on a theory of strict products liability. Such contention evolves from the position of Freightliner that the accident itself and not the subsequent fire resulted in Billy and Dee Maxey's death.
 
 
 39
 The trial court summarized the defective nature of the fuel system as follows:
 
 
 40
 Freightliner designed the fuel system on the truck-tractor so that the diesel fuel containers, commonly called saddle tanks, were located near the frame rails. The design placed the fuel tanks in proximity to occupants and close to ignition sources. These aluminum tanks lacked a flexible bladder to absorb impact and fuel line fittings which would separate in a crash, devices designed to reduce the fire hazard of the crash.[4]
 
 
 41
 The Maxey's expert, Mr. Robertson, was a transportation safety engineer qualified as an expert in accident reconstruction, design of crash resistant fuel systems, study of body behavior and injury producing mechanisms in crashes, including toxic hazards from fires.[5] His testimony preparation included viewing the remains of the wreckage, the accident scene, the photos, technical reports and statistics regarding truck fire hazards, reading all depositions taken in the case, looking at the police report and studying engineering drawings of the truck.[6] Robertson testified that the noxious fumes contained in the smoke from the fuel fire incapacitated the Maxeys and prevented their escape from the vehicle.[7] Appellees take the position on appeal that such testimony was nothing more than speculation. The jury and the trial judge found otherwise.
 
 
 42
 We think that Robertson was a qualified expert whose testimony reached a level above that of speculation or mere conjecture and formed a sufficient basis for the products liability claim of the Maxeys.
 
 
 43
 On May 8, 1978, appellee filed a conditional motion for a new trial on the ground of newly discovered evidence. Since this was based upon evidence discovered subsequent to the trial proceedings, it did not appear in the record of the trial on its merits. The trial court was not called upon to rule on this issue. The appellee sought no ruling or hearing on said motion by this court, save in the event that we should disturb the judgment below. In light of our ruling herein, we deem this motion moot.
 
 
 44
 AFFIRMED.
 
 SAM D. JOHNSON, Circuit Judge, dissenting:
 
 45
 This writer concurs in part III of the Court's opinion and dissents from parts I and II. The Court's opinion strikes the jury's award of exemplary damages on two grounds. First, no evidence supports the jury's finding that the defendant Freightliner consciously disregarded the rights and welfare of others. Second, Freightliner's compliance with industry custom in the design of truck fuel systems precludes an award of exemplary damages. This writer's review of the record indicates that ample evidence supports the jury's verdict. The Court's opinion, however, makes no attempt whatsoever to analyze this evidence or to explain why it does not support the jury's finding. The Court reaches its second basis for striking the jury's award of exemplary damages, compliance with industry custom, with a similar lack of analysis.
 
 Exemplary Damages in Products Liability
 
 46
 The Texas Constitution provides that, "Every person, corporation, or company, that may commit a homicide, through a wilful act, or omission, or gross neglect, shall be responsible, in exemplary damages, to the surviving husband, widow," and heirs of the deceased. Tex.Const. art. XVI, § 26. The jury in this case awarded exemplary damages based on its finding of Freightliner's gross negligence. Almost 100 years ago, Chief Judge Stayton of the Texas Supreme Court defined gross negligence in a passage to which the Texas courts still refer today.
 
 
 47
 Gross negligence, to be the ground for exemplary damages, should be that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons to be affected by it.
 
 
 48
 Missouri Pacific Railroad Co. v. Shuford, 72 Tex. 165, 10 S.W. 408, 411 (1888) (emphasis original).
 
 
 49
 The Court's opinion in this case apparently accepts the proposition that a manufacturer can be liable for exemplary damages because of its gross negligence in designing, manufacturing, or marketing a product. The Texas Supreme Court has not addressed the issue, but two intermediate appellate courts have indicated that in the proper case they would allow the recovery of exemplary damages from a manufacturer liable for actual damages in products liability. In Heil Co. v. Grant, 534 S.W.2d 916, 926 (Tex.Civ.App. Tyler 1976, writ ref'd n. r. e.) the court stated, "We believe that exemplary damages may be recovered under (article XVI, Section 26) of the Texas Constitution in a strict liability action for the death of the user of a defective product." The district court in the instant case stated that the quoted language from Heil Co. v. Grant is dictum. 450 F.Supp. at 961. A close analysis of Heil Co. v. Grant, however, reveals that in the statement quoted above, the court was setting forth the law the trial court was to apply on remand. 534 S.W.2d at 926. The statement is not dictum. In Newding v. Kroger, 554 S.W.2d 15 (Tex.Civ.App. Houston (14th Dist.) 1977), the court stated the plaintiff could recover exemplary damages in a products case, but then held that the plaintiff had failed to produce evidence of gross negligence.
 
 
 50
 Furthermore, a Texas district court has entered judgment on a jury's award of punitive damages in a products liability case with facts similar to those of the instant case. Smith v. Cessna Aircraft Co., No. 70-9255-L, 193d Jud.Dist.Ct.Dallas Co., Texas, Nov. 26, 1972, noted in 16 Amer. Trial Law. Ass'n Newsletter 30 (1973) and Owen, Punitive Damages in Products Liability Litigation, 74 Mich.L.Rev. 1257, 1341-42 (1976). In Smith v. Cessna Aircraft Co., a plane manufactured by the defendant aborted its takeoff and crashed through a fence at a speed of less than 30 miles per hour. The crash itself did not injure the plane's passengers. The crash, however, ruptured the plane's fuel tank, and the fuel cascaded into the cabin, burning three passengers to death and injuring a fourth. The jury awarded $180,000 in punitive damages for the defendant's gross negligence in failing to test the plane's fuel system for crashworthiness.
 
 
 51
 The district judge in the instant case also concluded that the Texas courts would allow the recovery of exemplary damages in a products liability case. 450 F.Supp. at 962. He reasoned that the basis of products liability and the purpose of products liability differ from the basis of and the purpose of liability for exemplary damages, but that these differences were no obstacle to recovery on both grounds of liability in a single proceeding. The basis of recovery in products liability is the marketing of a defective product, and the purpose of products liability is to compensate an injured party for his loss and to redistribute his loss. Id. at 961. The basis for liability for exemplary damages is gross negligence. The purpose of liability for exemplary damages is to punish wrongdoers and to deter wrongful conduct in the future. Id.; Bennett v. Howard, 141 Tex. 101, 170 S.W.2d 709, 713 (1943); J. S. Abercrombie Co. v. Scott, 267 S.W.2d 206, 212 (Tex.Civ.App. Galveston 1954, writ ref'd, n. r. e.). Exemplary damages can serve to punish and deter grossly negligent product manufacturers just as it punishes and deters other grossly negligent defendants. See Owen, supra, at 1261 ("punitive damages may be usefully employed in products liability litigation to punish and deter the marketing of defective products in flagrant disregard of the public safety"). Freightliner should be liable for exemplary damages in this case if it was gross negligence under Texas law.
 
 Atlas Chemical
 
 52
 As stated above, gross negligence in Texas is simply that entire want of care that raises the inference that the defendant's act or omission was the result of conscious indifference to or disregard for the right or welfare of others. Whether a defendant was grossly negligent depends on all the facts and circumstances surrounding that defendant's acts or omissions. No single element of the defendant's conduct is dispositive. Siebenlist v. Harville, 596 S.W.2d 113, 115 (Tex.1980); McPhearson v. Sullivan, 463 S.W.2d 174, 176 (Tex.1971). The cases have never gone much further than Shuford did in defining gross negligence. This is understandable because the definition of gross negligence must be sufficiently broad to encompass a great variety of conduct by defendants. In 1975 the Texas Supreme Court spoke, in Atlas Chemical Industries, Inc. v. Anderson, 524 S.W.2d 681 (Tex.1975), to settle two uncertainties in the law on gross negligence. Atlas Chemical established two propositions: (1) evidence of slight care on the part of a defendant does not preclude an award of exemplary damages; (2) exemplary damages will lie for an omission or a failure to act of the defendant. This Court recognized the import of Atlas Chemical in Knabe v. National Supply Division of Armco Steel, 592 F.2d 841 (5th Cir. 1979), a case the majority does not discuss.
 
 
 53
 In Atlas Chemical, a landowner sued the defendant chemical company for damage to his land caused by the company's discharge of industrial waste upstream from the land. The jury awarded the plaintiff compensatory and exemplary damages. In its initial opinion, the Texas Supreme Court reversed the award of exemplary damages, holding that the evidence did not support a finding of gross negligence as defined in Shuford. The court stressed the fact that the chemical company had reduced the amount of suspended solids in its discharge from 8,410 parts per million to 449 parts per million. On rehearing, seven justices changed their positions, and the court reversed itself.
 
 
 54
 At some point and under all the circumstances, the failure to make any correction to save downstream property owners from damage finally warrants a decision by the trier of fact that the managerial decision for this operation was made wholly without regard, and with conscious indifference to the rights of the property owners.
 
 
 55
 524 S.W.2d at 688. The court went on to note that for years the defendant "did nothing of any significance" to avoid damage to the property downstream from its plant. By reducing the suspended solids in its discharge, the defendant clearly exercised slight care to avoid injury to others. This alone was not enough to preclude liability for exemplary damages. Atlas Chemical establishes that a defendant is liable for exemplary damages if, in light of all the surrounding circumstances, it failed to exercise any care, or it exercised so slight a degree of care, that the fact finder could conclude that the defendant was consciously indifferent to the rights or welfare of others.
 
 
 56
 A simple linear scale illustrates the various degrees of care a defendant can exercise and the liability concomitant with those degrees. At the top of the scale is absolute care; a defendant who exercises absolute care is not liable in negligence. At the bottom of the scale is no care. The exercise of no care makes a defendant liable for actual damages based on negligence and for exemplary damages based on gross negligence. Reasonable care lies somewhere in the middle of the scale, and a defendant whose exercise of care places it above the reasonable care point on the scale is not liable for actual damages in negligence.
 
 
 57
 The final point on the scale falls below reasonable care and marks the exercise of so slight a degree of care that the defendant is grossly negligent and may be liable for exemplary damages. The grossly negligent point and the no care point are not identical. A defendant may have exercised some very slight degree of care and yet still have been consciously indifferent to the rights and welfare of others. No single element of a defendant's conduct even the exercise of slight care conclusively determines whether the defendant was consciously indifferent.
 
 
 58
 This Court unfortunately resurrected the slight care defense to exemplary damages in Hernandez v. Smith, 552 F.2d 142 (5th Cir. 1977). The Hernandez opinion, however, did not cite Atlas Chemical. Instead, it relied on a Fifth Circuit case decided before Atlas Chemical, Ballenger v. Mobil Oil Corp., 488 F.2d 707 (5th Cir.), cert. denied, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974). The majority in this case also relies on Hernandez, ignoring both Atlas Chemical and a recent decision of this Court, Knabe v. National Supply Division of Armco Steel. In Knabe, this Court reinstated the jury's award of exemplary damages, reversing the trial court's grant of a judgment notwithstanding the verdict for the defendant. The Court recognized that under Atlas Chemical, the exercise of some slight care does not preclude the award of exemplary damages. "Although the evidence showed that National Supply, like Atlas (Chemical Company), had made some efforts to correct the problem, those efforts were neither thoroughgoing nor effective." 592 F.2d at 845.
 
 
 59
 Atlas Chemical also clarified the proposition that exemplary damages can lie for a defendant's failure to act. There had been cases that said exemplary damages would not lie for "passive or negative rather than positive or affirmative" negligence. See, e. g., Sheffield Division, Armco Steel Corp., 376 S.W.2d at 832. This is at odds with the constitutional provision that provides exemplary damages can lie for an omission of the defendant. Tex.Const. art. XVI, § 26. In Atlas Chemical the court stated that, "At some point . . ., the failure to make any correction . . . finally warrants a decision" that the defendant acted with conscious indifference to the rights of others. 524 S.W.2d at 688. Thus, in Atlas Chemical the Texas Supreme Court approved an award of exemplary damages based on the defendant's failure to act.
 
 The Standard of Review
 
 60
 In reviewing the grant of a judgment notwithstanding the verdict, this Court must consider all the evidence (not just the evidence supporting the verdict), making all reasonable inferences supporting the verdict. We must reverse the grant of a judgment notwithstanding the verdict if reasonable people in the exercise of impartial judgment might reach different conclusions whether exemplary damages were proper. Boeing Company v. Shipman, 411 F.2d 365, 374-75 (5th Cir. 1969) (en banc); Knabe, 592 F.2d at 844-45. In short, we must decide whether Freightliner exercised so slight a degree of care in designing its fuel system that the jury could reasonably infer that Freightliner was consciously indifferent to the rights and welfare of others.
 
 The Evidence Supporting the Verdict
 
 61
 The plaintiffs in this case alleged and the jury found that Freightliner was grossly negligent in designing the fuel system on its truck tractor. As the majority opinion in this case acknowledges, the Freightliner tractor carried 160 gallons of fuel in two lightweight aluminum "saddle" tanks strapped to the outside of the truck frame rails. Figures 1 and 2, as set out in the Appendix, show the location of the fuel tanks. Plaintiffs alleged and the jury found that the Freightliner fuel system was unreasonably dangerous. Plaintiffs' expert testified that the fuel system was unreasonably dangerous because: the fuel tanks were placed in an anticipated impact area; the system was not designed to minimize spillage in the event of a puncture of a gas tank; and there was no barrier between the passenger cab and the fuel tanks to protect the cab's occupants if the fuel caught on fire.
 
 
 62
 Plaintiffs' expert testified that Freightliner could have minimized the risk of harm to the occupants of its trucks by locating the fuel tanks away from anticipated impact areas on the truck. The expert proposed several alternative designs that would have reduced the chance a collision would rupture a fuel tank. These alternative designs are shown in Figures 3, 4, and 5 in the Appendix. Alternatively, the expert stated that if Freightliner could not locate the fuel tanks outside of an impact area, that it could reduce the risk of a fire by equipping the tanks with flexible bladders and detachable couplings that would retain the fuel in the event of an impact and a rupture of a tank or a fuel line.
 
 
 63
 Freightliner does not challenge the jury's finding that the fuel system was defective. The fuel system was defective because Freightliner failed to take steps to make it safer. Plaintiffs argued to the jury that Freightliner's failure to take steps to design a safe fuel system made it liable for exemplary damages. This Court cannot overturn the jury's verdict awarding exemplary damages unless, based on the evidence in the record, Freightliner acted with such a degree of care in designing its fuel system that the jury could not reasonably infer that Freightliner was consciously indifferent to the rights and welfare of others.
 
 
 64
 The evidence that makes such an inference reasonable includes the following:
 
 
 65
 1. In 1965, Freightliner conducted a drop test to determine the strength of fuel tanks like those on the truck involved in this case. The drop test ruptured the tank, but Freightliner did nothing to modify the tank's design or to conduct further tests.
 
 
 66
 2. Freightliner never crash tested any of its products before marketing them, and it did not even consider the costs of crash testing. Freightliner does not employ any crash safety experts on its staff despite the fact that it has annual sales of almost $300 million.
 
 
 67
 3. Freightliner knew that 43 percent of all accidents exposed tractor saddle tanks to impact, but it continued to design its trucks with the saddle tanks located within one inch of the outside edge of the tractor. Freightliner neglected to obtain government statistics showing the frequencies of fire in tractor trailer accidents. Freightliner refused to acknowledge that fuel tanks should not be placed in anticipated impact areas.
 
 
 68
 4. Freightliner did nothing to modify its fuel system even after litigation before this suit pointed out possible deficiencies in the fuel system.
 
 
 69
 5. Freightliner does not keep records indicating the frequency of fire or injuries in collisions involving its trucks.
 
 
 70
 6. Freightliner claimed it was unaware that fuel tank bladders were available, even though these bladders had been available since the 1940's. Freightliner knew nothing of alternative fuel system designs that had been discussed in engineering literature since the 1940's.
 
 
 71
 7. Freightliner designed the fuel system to accommodate a fuel tank on the right side next to the exhaust pipe, an ignition source in the event of a rupture of the fuel tank.
 
 
 72
 In my view, this is ample evidence that makes reasonable the jury's inference that Freightliner consciously disregarded the rights and welfare of others in designing and marketing its tractors and fuel systems. The majority in this case states simply that, "We are unable to discern from our reading of the record evidence of appellee's (Freightliner's) failure to use even 'slight' care." In contrast, this writer fails to find evidence in the record indicating that Freightliner used any care whatsoever in designing its fuel system. Freightliner appears to have given no thought whatsoever to the fire hazards and the risks of personal injury created by its fuel system. The majority in this case has, it is respectfully submitted, improperly substituted its judgment for the jury's.[1]
 
 
 73
 Compliance with Custom as Precluding an Award of Exemplary Damages
 
 
 74
 The district court did not hold that the plaintiffs failed to produce sufficient evidence from which the jury could reasonably infer that Freightliner acted with conscious indifference to the welfare of others in designing its fuel system. Instead, the district court held that compliance with industry custom precluded an award of exemplary damages on the facts of this case. The district court found that Freightliner's design of its saddle tanks, including both the location and the absence of bladders, is common to the entire trucking industry.
 
 
 75
 The critical circumstance is that to sustain this award one must be prepared to hold that the entire automotive and trucking industry in the United States has ". . . acted intentionally or willfully or with that degree of 'gross negligence' which approximates a fixed purpose to bringing about . . . injury . . .". Woolard v. Mobil Pipe Line Company, 479 F.2d 557, 565 (5th Cir. 1973). Refusing to do so on this record is not simply an expression of a more sanguine view of business and industry than was held by the jury. Nor is the refusal an expression of blind faith that the entire trucking and automotive industry cannot be at fault. It is to say that adopting a design common to all manufacturers and millions of vehicles for over thirty years is a sufficient effort at safety to preclude a finding that Freightliner acted with an intent which approximates a fixed purpose to bring about this injury.
 
 450 F.Supp. at 964.[2]
 
 76
 Allowing compliance with industry custom as a defense to exemplary damages it is not only erroneous as a matter of law but is also bad policy. Such a rule allows an entire industry to consciously disregard the rights and welfare of others and thereby insulate itself from any liability for exemplary damages. Industry custom will frequently be an excuse for doing nothing. It can be a psychological excuse for inaction as, for example, when a manufacturer says, "No one else does this, why should I?" Industry custom can also be an economic disincentive to take action. For example, a manufacturer might reason that, "If I take steps to design my product safely, it will become more expensive than my competitors' products and will not sell." Industry custom may well deter safe product design. It can embody and preserve conscious disregard for the welfare of others.[3]
 
 
 77
 Texas law, as discussed above, allows the recovery of exemplary damages to punish and deter wrongdoers. The question of whether exemplary damages are ever appropriate against a manufacturer who has complied with industry custom becomes to me the question whether society will ever be served by deterring manufacturers from complying with industry custom. It is submitted that this case illustrates a situation in which the deterrent value of exemplary damages will serve society by deterring an industry from blindly following its custom. The truck manufacturing industry has designed its tractors with lightweight fuel tanks located where they are bound to be struck and punctured in a collision. This design, somewhat perversely, uses the fuel tanks to insulate the tractor's structural beams from a collision. Even a weak imagination will grasp the concept that the tractor structural beams should insulate the fuel tanks from the impact of a collision. This is exactly what plaintiffs proposed in the alternative designs they offered. Freightliner's apparent failure to give any consideration to alternative designs that might increase the safety of their product demonstrates conscious indifference and disregard for the rights and welfare of others. Allowing exemplary damages in this case would induce product manufacturers to consider how they can make their products safer.
 
 Conclusion
 
 78
 The majority opinion in this case has three major vices. First, it misinterprets the Texas definition of gross negligence in derogation of prior cases from the Texas Supreme Court and this Court. Second, it overturns a jury verdict without any analysis or discussion of the evidence in the case. Third, it establishes a novel and questionable defense to exemplary damages. I dissent.
 
 APPENDIX
 
 79
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 80
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 81
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 82
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 83
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 *
 District Judge of the Southern District of Alabama, sitting by designation
 
 
 [1]
 Tr. 323-324
 
 
 [2]
 Tr. 215, 217, 491, 764
 
 
 [3]
 Tr. 765
 
 
 [4]
 450 F.Supp. 955, 957 (1978)
 
 
 [5]
 Tr. 290, 292, 297, 300-305
 
 
 [6]
 Tr. 307
 
 
 [7]
 Tr. 344-346
 
 
 [1]
 As the district court noted, the verdict in this case was not "the product of passion or prejudice." 450 F.Supp. at 966. The jury's award of actual damages was very parsimonious. They awarded only $150,000 in actual damages to cover the pecuniary losses suffered by the nine and twelve year old children of the decedents. Furthermore, the jury denied any recovery whatsoever to Billy Maxey's parents even though "a substantial sum would have been supportable." Id
 Regrettably, the amount of the jury's award of exemplary damages may have improperly influenced the result the majority reaches. The jury awarded $10 million in exemplary damages, 67 times its award of actual damages. Recent Texas cases establish that exemplary damages must be reasonably proportionate to actual damages and require a remittitur of a portion of the exemplary damages in this case. See, e. g., Parker v. McGinnes, 594 S.W.2d 550, 552 (Tex.Civ.App. Waco, 1980) ("It is the settled rule in Texas that the amount of exemplary damages should be reasonably proportioned to the actual damages awarded.").
 
 
 [2]
 The district court applied an improper standard for the award of exemplary damages. Plaintiffs needed to show Freightliner's gross negligence. They did not need to show Freightliner acted with a fixed purpose to injure. The majority opinion concedes that the district court might have applied an improper standard and then goes on to apply its own "slight care" standard and to endorse the compliance with industry custom defense created by the district court
 
 
 [3]
 Conscious indifference to the welfare of others by an entire industry is not unprecedented. See U. Sinclair, The Jungle (1906), noted in N.Y. Times, Nov. 26, 1968 at 34, col. 4 (describing The Jungle as exposing "the grossly unsanitary practices in the Chicago meatpacking industry . . . (and leading) to the passage of the first Food and Drug Act")